DIFCO LABORATORIES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 12168.   Promulgated April 20, 1948.

John M. Hudson, Esq., for the petitioner.
Wesley A. Dierberger, Esq., for the respondent.

OPINION.

DISNEY, *Judge*: We shall first dispose of the respondent's motion to dismiss the proceeding, in so far as it relates to income tax for 1942, for want of jurisdiction. The respondent determined an overassessment of $1,873.07 in income tax and a deficiency of $12,829.19 in excess profits tax for that year. The petition contains allegation of error as to both the overassessment of income tax and the deficiency of excess profits tax. Section 272 of the Internal Revenue Code gives taxpayers the right to petition the Tax Court for a redetermination of deficiencies determined by the Commissioner in respect of the tax (income tax) imposed by Chapter 1 of the Code. It does not authorize a petition in any case other than where there has been a determination of a deficiency in respect of the tax imposed by this chapter.

Section 729 of the Internal Revenue Code, which is a part of chapter II of the code, provides as follows:

SEC. 729. LAWS APPLICABLE.

(a) GENERAL RULE.—All provisions of law (including penalties) applicable in respect of the taxes imposed by Chapter 1, shall insofar as not inconsistent with this subchapter, be applicable in respect of the tax imposed by this subchapter.

The effect of this provision is to permit the filing of petitions for redetermination of deficiencies of excess profits tax in the same manner as deficiencies in income tax. We find the following language in *Will County Title Co.*, 38 B. T. A. 1396.

\* \* \* In a long line of cases, of which *Cornelius Cotton Mills*, 4 B. T. A. 255, is a leading one, we have held that the determination of a deficiency is vital to our jurisdiction, and that we have no jurisdiction where the Commissioner determines that there is an overassessment. As the basic jurisdictional element of the determination of a deficiency is the same under both the income tax and excess profits tax provisions of the statute, the holdings in the income tax cases on the jurisdictional question here presented require a like holding here. We are accordingly of the opinion, and so hold, that we have no jurisdiction in this proceeding in so far as the petition is based on the Commissioner's determination of an overassessment of excess profits tax.

The income tax mentioned in the notice of deficiency and the excess profits tax are separately imposed, so that a determination of deficiency in one does not support any jurisdiction of this Court over a determination of an overassessment in the other. See *Pioneer Parachute Co.,* 4 T. C. 27, and the cases cited therein. Respondent's motion to dismiss is accordingly granted.

Our first question on the merits is whether expenditures made for alterations and changes in a building used in petitioner's business are deductible for Federal tax purposes as business expenses, or were, on the other hand, capital expenditures? Petitioner argues that the expenditures here in question should be allowed under section 23 (a) (1) of the Internal Revenue Code as ordinary and necessary business expense; further, that Regulations 111, section 29.23 (a)–4, applies where it provides that "The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as expense, provided the plant or property account is not increased by the amount of such expenditures." The leading case, says petitioner, in construing the statutes and regulations here involved, is *Illinois Merchants Trust Co., Executor,* 4 B. T. A. 103, where the rule was announced, as follows:

\* \* \* In determining whether an expenditure is a capital one or is chargeable against operating income, it is necessary to bear in mind the purpose for which the expenditure was made. To repair is to restore to a sound state or to mend, while a replacement connotes a substitution. A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life. It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired. Expenditures for that purpose are distinguishable from those for replacements, alterations, improvements or additions which prolong the life of the property, increase its value, or make it adaptable to a different use. The one is a maintenance charge, while the others are additions to capital investment which should not be applied against current earnings. \* \* \*

Petitioner contends that under this rule the expenditure here in question clearly is an ordinary business expense, chargeable against operating income of the current year, because no part thereof was for replacements, improvements, or additions which prolonged the useful life of the property or increased its value or made the property adaptable to a different use.

The respondent, in his brief, relies on the above cited quotation from the *Illinois Merchants Trust Co.* case, along with the following quotation from *Union Pacific R. R. Co.* v. *United States,* 99 U. S. 402:

Theoretically, the expenses chargeable to earnings include the general expenses of keeping up the organization of the company, and all expenses incurred in operating the works and keeping them in good condition and repair; whilst expenses chargeable to capital include those which are incurred in the original

construction of the works, and in the subsequent enlargement and improvement thereof.

The Supreme Court quotation was also cited with approval in the *Illinois Merchants Trust Co.* case.

Applying these principles to the facts in the instant appeal, we find that prior to 1941 petitioner conducted in the basement of building No. 2 an operation which was isolated from the rest of the plant and involved special equipment. The material manufactured there was light and was easily handled from one level to another. The entrance to the basement of building No. 2 was through the basement of building No. 5. Prior to 1939 the basement of building No. 5 was used for storage. In 1942 petitioner obtained orders from the Government which so increased its volume of work that the space in the basement of buildings Nos. 2 and 5 had to be used. The materials produced in 1942 were quite heavy and could not be readily handled by hand over the difference in the basement levels. There was equipment in the basement rooms of such buildings which could not be moved to other parts of the buildings and petitioner wished to make use of such equipment in order to have the fullest possible capacity with available facilities. To that end petitioner determined to adjust the levels of the two basements, so that ordinary factory wheeled-trucks could pass readily from one room to the other. Concurrently, the elevator shaft was extended to the adjusted level of the basements, so that the material produced therein could be taken in wheeled-trucks in the elevator and moved to the third floor to further process them.

For more efficient operation and utilization of the basement rooms of buildings No. 2 and No. 5, petitioner in 1942 determined to lower the basement floor of building No. 5 to the same level as that of building No. 2 and to extend the elevator shaft to the new level.

From the above quoted *Illinois Merchants Trust Co.* case, we note the following: "Expenditures for that purpose [repairs] are distinguishable from those for replacements, alterations, improvements or additions which prolong the life of the property, increase its value, or *make it adaptable to a different use.*" (Italics supplied.)

The fact that the basement of building No. 5 was lowered 22 inches, along with the other alterations connected therewith, was for the purpose of adjusting the levels of the two basements so that factory wheeled-trucks could pass readily from one room to the other brings the instant case within the rule above stated. It is clear that the lowering of the floor and elevator, particularly, was to make the basement adaptable to a different use.

In the case of *Black Hardware Co.* v. *Commissioner*, 39 Fed. (2d) 460; certiorari denied, 282 U. S. 841, the petitioner owned a three-story brick building in Galveston, Texas. The lower floor was raised

approximately four and one-half feet to protect it against flood tide. The court held that the improvements did not prolong the life of the building, nor did it increase its value, but it became more valuable for the use of the petitioner in his business. The Board's opinion was affirmed in that the expenditures for the improvements and betterments should be added to petitioner's capital investment. So, in the instant case, the lowering of the floor and the elevator, along with the other changes, may not have prolonged the life of the building and may not have increased its value, but it did become more valuable for the use of the petitioner in its business and, therefore, as in the *Black Hardware Co.* case, the expense should be added to petitioner's capital investment. *American Bemberg Corporation*, 10 T. C. 361, is distinguishable, being a case of repairs.

From the cases cited in petitioner's brief it is apparent that he claims the expense as a repair. The *Illinois Merchants Trust Co.* case, *supra*, distinguishes repairs from replacements, as follows: "To repair is to restore to a sound state or to mend, while a replacement connotes a substitution." There is no semblance of "mending" or "restoring to a sound state" of the floor here in question. The old floor was completely replaced by a new one some 22 inches lower than the original. The extending of the elevator to the lower level could not be considered mended or restored, for, as for that part of the elevator, it had not previously been in existence. True, some of the material used in the process of lowering the floor was salvaged from the old floor, but, applying the facts here to the definition above quoted, we hold that the expense of lowering the floor was a replacement and thereby classified as a capital expenditure.

The issue of excess profits credit based on income actually resolves itself into a question of whether the full amount of $45,800 for which the 229 shares of stock were sold on February 25, 1942, constitutes a capital addition for 309 days during the taxable year 1942. The respondent contends that only the cash actually paid to the petitioner, pursuant to the contracts and notes given by the purchaser, and not the value of the notes, constitutes a capital addition under section 713 (a) of the Internal Revenue Code, as amended (resulting, considering previous stock reductions, in a net capital reduction. Section 713 (a) (1) (B) provides, in substance, that the excess profits credit for any taxable year, computed under this section, shall be increased by 8 per cent of the net capital addition as defined in subsection (g). The pertinent part of subsection (g) is as follows:

(g) ADJUSTMENTS IN EXCESS PROFITS CREDIT ON ACCOUNT OF CAPITAL CHANGES.—For the purposes of this section—

(1) The net capital addition for the taxable year shall be the excess, divided by the number of days in the taxable year, of the aggregate of the daily capital

addition for each day of the taxable year over the aggregate of the daily capital reduction for each day of the taxable year.

\* \* \* \* \* \* \*

(3) The daily capital addition for any day of the taxable year shall be the aggregate of the amounts of money and property paid in for stock, or as paid-in surplus, or as a contribution to capital, after the beginning of the taxpayer's first taxable year under this subchapter and prior to such day. In determining the amount of any property paid in, such property shall be included in an amount determined in the manner provided in section 718 (a) (2). \* \* \*

The question here then, in the final analysis, is whether the notes given by the purchasers constitute "property" as expressed in section 713 (g) (3). The word "property," as used in the above statute, is not limited in any way in its meaning. There are no distinctions drawn either as to real or personal property, as to tangible or intangible property, or any other. Our attention has not been directed to, and we have not found, a definition of the term "property" within the statute here considered. *Black's Law Dictionary* (3d Ed.), gives the following definition of intangible property:

Used chiefly in the law of taxation, this term means such property as has no intrinsic and marketable value, but is merely the representative or evidence of value, such as certificates of stock, bonds, promissory, notes, and franchises. [Citing many cases.]

It would, therefore, appear that the statute is sufficiently broad to include the notes here in question.

The respondent argues that "A question somewhat similar to the issue raised in this case has been considered in connection with the determination of invested capital under the excess profits tax laws that existed in 1917 and 1918," and that promissory notes, of face value, actually and in good faith paid for stock, not void under state law, were includible in invested capital; but in this the petitioner in general agrees, and cites such cases as *Langley & Michaels Co.*, 9 B. T. A. 1020; *Sheridan Meat Co.*, 10 B. T. A. 211; *Hewett Grain & Provision Co. of Escanaba*, 14 B. T. A. 281; *Boston Oldsmobile Co.*, 16 B. T. A. 114; *Columbus Brick Tile Co.*, 26 B. T. A. 794, and *Bowers* v. *Max Kaufmann & Co.*, 18 Fed. (2d) 69, holding in general that invested capital, as used in the statute then under consideration, included notes given in payment for stock of the corporations.

Respondent calls our attention to section 21.21 of chapter 195 of the General Corporation Act of Michigan, but does not seriously contend that it affects this case. He merely says that "The Michigan law makes the transaction in the instant case incomplete by prohibiting the delivery of the stock until it is fully paid for." He also says that "Apparently the stock in the instant case was not only issued but was delivered \* \* \*." Then he asks the question, "what effect the transaction had under the Michigan statute?" Due to the fact that

the stock here in question was issued and delivered and the validity of such acts is not challenged under the statute, we see no applicability of the respondent's argument. The stock was not void under state law. Respondent also cites *Liberty Mirror Works*, 3 T. C. 1018, and *Palomar Laundry*, 7 T. C. 1300, but these cases are distinguishable from the instant case. The *Liberty Mirror Works* case considers the point as to whether the amounts of debts forgiven and canceled by nonstockholder creditors in prior years should be included in the taxpayer's equity invested capital, while the *Palomar Laundry* case considers the question as to whether the value of preferred stock issued to brokers as a commission is excluded in the computation of invested capital. As we view the question, neither of these cases supports the contentions advanced by the respondent.

The respondent also challenges the petitioner's position on the ground that he has not established the value of the notes, as required under sections 718 (a) (2) and 113 (a) of the Internal Revenue Code.[2] Respondent's contentions here are without merit. The unadjusted basis here is cost, and, therefore, under Regulations 112, section 35.718–1, it is the fair market value of the stock issued for the notes. Petitioner has established that the stock here in question had a fair market value of $200 a share, due to the fact that the petitioner had some months previously purchased some of its own stock at $200 a share, and in 1942 paid dividends of 20 per cent on $100 par value. There is no evidence to the contrary. This sets the same value for the notes given for stock. Our conclusion as to value is corroborated by the fact that the signers of the notes, at all times subsequent to the purchase of the said stock, have owned net assets other than the stock purchased of a value substantially in excess of the amount of their notes given in payment for said stock; furthermore, that by March 11, 1947, seven of the purchasers had paid their notes in full and the remaining four, whose notes aggregated $20,800 face amount, had

---

[2] SEC. 718. EQUITY INVESTED CAPITAL.

(a) DEFINITION.—The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b)—

\* \* \* \* \* \* \*

(2) PROPERTY PAID IN.—Property (other than money) previously paid in (regardless of the time paid in) for stock, or as paid-in surplus, or as a contribution to capital. Such property shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange. If the property was disposed of before such taxable year, such basis shall be determined under the law applicable to the year of disposition, but without regard to the value of the property as of March 1, 1913. If the property was disposed of before March 1, 1913, its basis shall be considered to be its fair market value at the time paid in. If the unadjusted basis of the property is a substituted basis, such basis shall be adjusted with respect to the period before the property was paid in, by an amount equal to the adjustments proper under section 115 (1) for determining earnings and profits.

SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property ; except that \* \* \*

paid $9,729.96 upon the principal of their notes, as well as $4,068.03 interest. We believe the evidence in this case is more convincing than that considered to establish face value in *Harding Glass Co.*, 15 B. T. A. 621. We, therefore, hold that respondent did err in determining that petitioner had a net capital reduction of its excess profits credit based on income.

Reviewed by the Court.

*Decision will be entered under Rule 50.*