THE EMELOID CO., INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 15898.  Promulgated June 27, 1950.

*Sydney A. Gutkin, Esq.*, for the petitioner.
*Maurice S. Bush, Esq.*, for the respondent.

OPINION.

ARUNDELL, *Judge*: Before proceeding to the only issue argued by the parties, we shall dispose of petitioner's claim of overpayment of its income tax for the fiscal year ended June 30, 1944. No determination of a deficiency in income taxes has been made by respondent that would confer jurisdiction upon this Court whereby it could find an overpayment of income taxes. Since the income tax and excess profits tax are separately imposed, a determination of a deficiency in the latter will not give this Court jurisdiction of a determination of an over-assessment in the former. *Difco Laboratories, Inc.*, 10 T. C. 660. See also *Pioneer Parachute Co.*, 4 T. C. 27. Accordingly, petitioner's claim for overpayment of income taxes for 1944 is dismissed for lack of jurisdiction.

Concerning the excess profits tax deficiency determined by respondent, the only issue raised by petitioner is whether the $97,500 borrowed by petitioner in 1942 for the sole purpose of purchasing single premium life insurance policies of face amount of $100,000 each on the lives of Leeds and Madan, its two principal stockholders and officers, may properly be included in petitioner's borrowed invested capital as defined by section 719, Internal Revenue Code.[1]

Respondent's Regulations 112, section 35.719-1,[2] provides that to be includible in borrowed invested capital, an indebtedness must be (1) *bona fide* and (2) incurred for business reasons. Petitioner attacks the regulations as an invalid exercise of the respondent's authority going beyond the unambiguous terms of the statute. We regard this contention of petitioner's as foreclosed by our decision in *Hart-Bartlett-Sturtevant Grain Co.*, 12 T. C. 760, 769; affd., 182 Fed. (2d) 153 (CA-8, May 5, 1950), where we sustained the validity of the cited regulations. See also *Globe Mortgage Co.*, 14 T. C. 192.

---

[1] SEC. 719. BORROWED INVESTED CAPITAL.

(a) BORROWED CAPITAL.—The borrowed capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following:

(1) The amount of the outstanding indebtedness (not including interest) of the taxpayer which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust, plus,

\*        \*        \*        \*        \*        \*        \*

(b) BORROWED INVESTED CAPITAL.—The borrowed invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be an amount equal to 50 per centum of the borrowed capital for such day.

[2] SEC. 35.719-1 BORROWED INVESTED CAPITAL—The borrowed invested capital for any day of the taxable year is 50 per cent of the borrowed capital for such day determined as of the beginning of such day. Borrowed capital is defined to mean :

(a) Outstanding indebtedness (other than interest, but including indebtedness assumed or to which the taxpayer's property is subject) of the taxpayer which is evidenced by a bond, a promissory note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust, plus

\*        \*        \*        \*        \*        \*        \*

In order for any indebtedness to be included in borrowed capital it must be bona fide. It must be one incurred for business reasons and not merely to increase the excess profits credit. If indebtedness of the taxpayer is assumed by another person it ceases to be borrowed capital of the taxpayer. For such purpose an assumption of indebtedness includes the receipt of property subject to indebtedness.

It is indisputable that the indebtedness which petitioner incurred to purchase the insurance policies was *bona fide*. The debt was in the form of promissory notes given to a New York bank and was secured by the policies themselves. The only question which confronts us is whether the indebtedness satisfies the second requirement of respondent's regulations, *viz.*, that it be insured for business reasons.

In determining whether the money borrowed solely to purchase single premium life insurance policies on the lives of petitioner's two principal officers was borrowed for business reasons *of petitioner*, we much bear in mind that these two officers owned all of the common stock of petitioner. They determined and controlled all of petitioner's actions. When the transactions of such a closely held corporation become involved in tax litigation, its activities must be examined with a realistic eye to decide whether a similarly situated, diversely held corporation would pursue a like course of action or whether instead the corporate cloak is used to achieve discriminatory tax advantages for the controlling stockholders. We do not mean to imply, however, that a corporation, even when closely held, may not legitimately choose from two or more possible methods the one which will result in the lesser tax. It is not the province of the Commissioner to then say that a different method should have been adopted because it would have increased the Government's take. The line separating legitimate tax-minimizing corporate activities from tax-evading transactions utilizing the corporate guise may be difficult to draw as a generalization, but it becomes much easier when applied to a particular situation.

Here, the evidence is convincing, and we have found as a fact, that the insurance policies were purchased for reasons personal to Leeds and Madan rather than to benefit the petitioner. By the terms of the trust created in January, 1946, the petitioner transferred these policies to the trustee in order to provide funds for the purchase of the stockholdings in petitioner of the first to die of Leeds and Madan. These provisions make it abundantly evident that the true purpose of the insurance policies, and thus likewise the indebtedness incurred to purchase them, was to provide available funds at the death of either Leeds or Madan, so that the survivor would be readily enabled to purchase his deceased associate's interest. The benefit to the petitioner of such a transaction appears highly remote. Instead of being supplied with funds to tide it over a period of adjustment upon the death of a key employee, petitioner, under the trust agreement, would be compelled to use the life insurance proceeds to purchase and retire the stockholdings of its decedent-officer.

It may be noted that the trust arrangement was not indispensable to the insurance-stock purchase scheme worked out by Leeds and Madan. The trust provisions simply bring into clearer focus the

real purpose of the insurance. Without the trust, the survivor of Leeds and Madan at the death of his associate could have caused petitioner to apply the proceeds of the policies on the decedent's life to retire the stock owned by the decedent. Since retirement of the decedent's one-half of the common stock would leave the survivor as sole owner of all the outstanding common stock, the net effect would be to give him as full ownership and control as though he had purchased the decedent's stock directly from the decedent's estate. The only advantage of the trust arrangement was that Leeds and Madan could thereby agree in advance to the price at which the decedent's shares would be purchased and thus obviate the possibility of any bargaining difficulties between the survivor and the decedent's estate. Further, they could do so without irrevocably binding themselves to the price initially set out in the trust instrument, since the price fixed in the trust was declared subject to change by agreement of the parties. Also, the trust could be terminated at will by either Leeds or Madan during their joint lives by written notice to the trustee and parties. All of these provisions emphasize the manner in which any possible interest of petitioner in insuring the lives of key employees was subordinated to the interest of its two common stockholders, Leeds and Madan.

As petitioner was committed under the trust agreement to use the proceeds of the policies to purchase the holdings of the first to die of Leeds and Madan, it is evident that the indebtedness which it incurred to purchase the policies would never enter into petitioner's working capital so long as the reason for the policies was the necessity of their inclusion in the stock purchase plan. As was said in *Hart-Bartlett-Sturtevant Grain Co.* v. *Commissioner*, 182 Fed. (2d) 153:

Petitioner's argument fails to convince that its actions have brought it under the wording of Section 719 or Regulation 112, *supra*. We note that the statute does not provide for a credit based on a taxpayer's total asset value, but only upon invested capital. And while the sums borrowed by petitioner do constitute borrowed capital they do not constitute borrowed invested capital. The sums borrowed were never actually invested as a part of petitioner's working capital, they were never utilized for the earnings of profits and they were never subject to the risk of petitioner's business. Cf. *La Belle Iron Works* v. *United States*, 256 U. S. 377, 388, 389; *Commissioner* v. *South Texas Co.*, 333 U. S. 496, 497–498; *West Construction Co.* v. *Commissioner*, 7 T. C. 974, 978; *Player Realty Co.* v. *Commissioner*, 9 T. C. 215, 218.

Concluding, as we must from the evidence before us, that the policies here were purchased as part of a stock purchase plan for the personal interests of petitioner's two common stockholders and not for any business purpose of petitioner itself, we must approve the respondent's determination.

*Decision will be entered under Rule 50.*