*Decision will be entered under Rule 50.*

RED STAR YEAST AND PRODUCTS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 48691. Filed November 30, 1955.

322

*Harvey W. Peters, Esq.*, for the petitioner.
*George T. Donoghue, Jr., Esq.*, for the respondent.

324

OPINION.

FISHER, *Judge:*

*Best Yeast Payments.*

In each of the years 1943 and 1944 petitioner paid $50,000 to Best Yeast under an agreement with that company, dated May 21, 1943. These amounts were deducted by petitioner in 1943 and 1944 as ordinary and necessary business expenses under section 23 (a) of the Internal Revenue Code of 1939. Respondent has capitalized both payments and has not allowed any deduction for depreciation in either of the years 1943 or 1944, or in any of the subsequent years involved in this proceeding.

Petitioner's main contention is that the expenditure in question was not made to acquire, develop, or improve a capital asset, but was incurred only for certain technical assistance and know-how services rendered to petitioner by Best Yeast in connection with petitioner's undertaking to engage in the manufacture of dry yeast. Petitioner argues that in the circumstances of the instant case such expenditure should be considered currently deductible as an ordinary and necessary business expense. We cannot agree.

In January 1943, some 4 months before Red Star entered into a contract with Best, petitioner had developed a laboratory technique and process (described generally in our Findings of Fact, *supra*) for producing active dry yeast. Samples so produced had tested well, satisfying the standards and specifications of both the Department of Agriculture and Quartermaster Research. Subsequent to the January F–80 series of experiments, petitioner continued its research, conducting further experiments along these same lines, and was able to produce additional samples of active dry yeast which also tested satisfactorily. In view of these successful experiments, petitioner, on May 21, 1943, the same date on which the contract with Best Yeast was entered into, stepped up its scale of operation and undertook to produce active dry yeast in its pilot plant, in accordance with the basic process and technique developed in the F–80 series of experiments.

Clearly, for some time prior to entering into the contract with Best Yeast in May 1943, petitioner knew it had a satisfactory laboratory technique and process for producing active dry yeast, meeting Army standards. But conversion from the laboratory to commercial production in accordance with the technique and process so developed would involve a large expenditure of money for special equipment. Red Star's management, considering that petitioner had never before produced dry yeast commercially, appears to have been somewhat apprehensive of the substantial risks inherent in such conversion. Moreover, petitioner was being pressed by the Army to get into production as quickly as possible to supply the large Army demand for active

dry yeast. Accordingly, petitioner, upon the suggestion and advice of Irvin and Isker, proceeded to contact a commercial producer of dry yeast with which petitioner was not and would not be in competition, with a view to obtaining technical assistance to guide the necessary conversion and to confirm the adequacy or inadequacy of its own technique and process by comparing it with the techniques and processes then being employed by a commercial producer of dry yeast, and if necessary, to learn of or to develop an economical process and technique for producing active dry yeast. On May 21, 1943, petitioner entered into a contract with Best Yeast of Canada, hoping thereby to perhaps accelerate conversion from its laboratory scale to commercial production, to glean whether the process and the technique it had thus far developed were superior or inferior to those currently employed by a producer of dry yeast and thus be better able to evaluate the quality and economic feasibility of utilizing the process it had already developed, to study such a producer's production techniques and methods, and to obtain cost and other production data.

We have carefully reviewed the circumstances under which the services of Best were sought and employed by petitioner, the terms of the contract with Best Yeast, and the services rendered to petitioner by the representatives of Best Yeast, and we think that petitioner did not intend to and never did acquire everything possessed by Best in the way of knowledge, skills, methods, techniques, formulas, processes, materials, and other data relating to the commercial production of dry yeast, somewhat in the nature of a unitary process, for use as such. Petitioner only intended to obtain certain technical assistance from an experienced producer of dry yeast. The contract with Best clearly recognized that the Best techniques and processes could not and would not be simply transferred in whole for production of active dry yeast by petitioner with its molasses base compressed yeast product, since the Best processes and techniques were developed for production of dry yeast from a sulphite liquor base. Thus it was provided that both parties contemplated and believed that Best could "with the knowledge and information * * * possessed by it * * * and the skills, methods or processes used by it in the making of its compressed yeast for drying, * * * adapt the same to compressed yeast made from a molasses base and prepare such yeast suitable for dehydration and marketing in the dry form * * *." Best, therefore, was engaged to render technical assistance in adapting its experience as a commercial producer of dry yeast to the particular requirements of petitioner's product. These services were to be based on the total of Best's experience and know-how in such manufacture, not with the aim of introducing or converting petitioner to the sulphite liquor process but with the purpose of adapting such techniques, skills, processes,

and know-how possessed by Best to the manufacture of dry yeast on the basis of petitioner's product.

Our view that petitioner contracted with Best for technical assistance services is further supported by the undertakings of the parties' representatives in their actual work together during July and August. The Best people and Red Star people worked closely together during that period on adapting the Best experience to petitioner's product, eventually producing satisfactory samples of active dry yeast. The process and technique ultimately developed was essentially different from any previously employed by Best and neither Best nor petitioner had any prior knowledge of the final process and technique.

From the beginning of their joint work, it was obvious to both groups that the Best experience could not be transferred in whole to production of active dry yeast with petitioner's type of compressed yeast. The first experiments undertaken on the advice of the Best representatives, based on Best's experience, were not successful and indicated clearly that the petitioner's basic product required a different process and technique for producing dry yeast. Block, who worked with Freund on the production of a compressed yeast suitable for drying, indicated that since his experience was with the sulphite liquor process he would have to feel his way with petitioner's molasses base product. Subsequently, Block and Freund, by working closely together, did evolve jointly a process and technique for producing a compressed yeast suitable for drying, samples of which tested satisfactorily. This process, however, was costly, and after the Best people left Milwaukee, Freund continued his experiments, ultimately developing a single-step synchronized process, described briefly and somewhat generally in our Findings of Fact. It was this later developed process that was finally employed by petitioner in its manufacture of active dry yeast in 1944.

Irvin and Breese also conducted their first experiments upon the instruction of Breese, but it was clear that his instructions, based on Best's experience, were not adequate for dehydrating petitioner's product and producing satisfactory samples of dry yeast. Irvin, drawing on his own experience with drying from January through April of 1943, prior to the contract with Best, and Breese, both working closely together, were finally able to produce a satisfactory product. But Irvin concluded that the Best people did not know as much about drying as petitioner's technicians and, after the Best people left, he returned to further experimenting along the lines he had previously followed, ultimately developing a technique and process which was different from that worked out jointly with Breese. This latter process and technique was finally employed by petitioner in its manufacture.

We think it is clear from the record that the experimentation carried on jointly by the representatives of both petitioner and Best during a 2-month period was not merely incidental to the acquisition by petitioner of a unitary process from Best. The experimentation carried on was contemplated by the contract between petitioner and Best, and was an essential and important part of the services to be rendered to petitioner, if the Best knowledge, experience, skills, techniques, processes, formulas, and other materials were to be adapted satisfactorily to the requirements of petitioner's basic type of yeast.

We think that the Best services, and the cooperative experimentation and research carried on by the representatives of Best and Red Star must be considered in connection with, and as an integral part of, the general program of research and experimentation undertaken by petitioner to develop a process and technique for the manufacture of active dry yeast.

Petitioner was engaged for some time in research, study, and experimentation in an effort to develop a process and technique for the successful manufacture commercially of active dry yeast. Whether the payments to Best Yeast constituted a cost incident to the development of that technique and process depends on whether the technical assistance and advisory services rendered to petitioner by Best were a part of and incident to the conduct by petitioner of its experimental research for development of a satisfactory commercial technique and process for the manufacture of dry yeast. It is our view that the services of Best are not significantly separable from the conduct by petitioner of its research and experimentation in development of a technique and process for the manufacture of dry yeast. The services contracted for and rendered by Best were primarily aid in research to adapt the Best experience and know-how to producing dry yeast from petitioner's molasses base compressed yeast product. It is clear, therefore, that the expenditure was really for development or in the course of development of a technique and process for the manufacture of dry yeast. It is true that further experimentation was carried on after the Best people left Milwaukee and that such experimentation and research was somewhat outside of the scope of the Best assistance. But from this perspective we think that the services rendered may be likened to a series of unsuccessful experiments conducted in the course of research and development of a process and obviously incident to and part of that development. While the information and services of Best were, perhaps, not otherwise beneficial in a practical sense, petitioner was at least heartened thereby and was confirmed in its confidence in the technical competence of its own research staff and in its reliance upon the commercial value and feasibility of the product resulting from their work. Upon consideration of the whole picture, we think that the expenditure here in issue was a capital expenditure

incurred in the course of and in connection with the development of a technique and process for the manufacture of active dry yeast, and was incident to and a part of petitioner's research and experimental activity undertaken to develop such a process and technique. *Hart-Bartlett-Sturtevant Grain Co.*, 12 T. C. 760 (1949), affd. (C. A. 8, 1950) 182 F. 2d 153; *Claude Neon Lights, Inc.*, 35 B. T. A. 424 (1937); *Hazeltine Corporation*, 32 B. T. A. 110 (1935), affirmed on this issue (C. A. 3, 1937) 89 F. 2d 513; *John F. Canning*, 29 B. T. A. 99 (1933).

*Homer L. Strong*, 14 B. T. A. 902 (1928), relied on by petitioner, is distinguishable from the instant case. There the taxpayer acquired a certain machine which had many mechanical imperfections. The taxpayer expended the amounts there in issue in an attempt to perfect the machine. However, the attempted improvements were not successful and the machine was considered to be imperfect and "an absolute failure" in the year of acquisition. We held that the expenditure did not result in the acquisition, development, or improvement of a capital asset having a useful life beyond the taxable year in which the outlay was made and permitted deduction of such amounts as losses sustained (or alternatively as expenses incurred) in that year. Such is not the instant case. Here the Best services were a part of petitioner's whole course of development of a technique and process for the manufacture of dry yeast, which program was ultimately successful, causing creation for petitioner of a process and technique subsequently used in commercial manufacture. Any lack of usefulness to petitioner of the particular services performed by Best under the contract would not render the expenditure therefor a business expense, but only in the proper circumstances a loss in a particular year upon proof of discard by petitioner of that process and technique in the development of which this expenditure and service was only a part. *W. B. Harbeson Lumber Co.*, 24 B. T. A. 542 (1931), also cited by petitioner, is distinguishable for essentially the same reasons.

Petitioner contends alternatively that the Best Yeast payments, if in the nature of a capital expenditure, as decided above, are nevertheless deductible as business expenses in the year in which made, in accordance with the respondent's publicly expressed policy regarding development and research expenditures. Petitioner argues that a statement of the position of the Internal Revenue Service by former Commissioner Dunlap to the Joint Committee on Internal Revenue Taxation, authorizes deduction of the payments as business expenses, if such deduction is consistent with petitioner's established method of accounting.

The criteria for expensing certain research and development costs as set forth by Commissioner Dunlap are, in part, as follows:

It is the policy of the Bureau, where the taxpayer under its established method of accounting has elected to adopt the practice of charging to expense research

and development costs, to allow such costs as deductions in computing net income. Such costs, however, may include only such expenditures as would normally be considered to represent research and development costs in the experimental or laboratory sense. Thus, in the case of experimental airplanes, the salaries of engineers working on development of the planes, the cost of materials which enter into the construction of the planes, the cost of test flights and similar expenditures is deductible as expense items. However, amounts paid out for new buildings and equipment including tools which have a substantial life beyond the taxable year, or which are adaptable for use other than the particular research or development project for which they were constructed or acquired, must be capitalized even though such buildings or equipment are necessary for the particular research or development project.

Petitioner argues that the payments to Best are such research and development costs as contemplated thereby and are properly deductible as business expenses in the year in which they are incurred. Respondent, on the other hand, contends that the circumstances of the payments to Best are not such as to bring petitioner within the purview of the policy set forth in the Commissioner's statement. Respondent contends mainly that the Best payments were not such expenditures as would normally be considered research and development costs in the experimental or laboratory sense. While we agree largely with petitioner's over-all conception of the nature of the Best expenditure, we must, nevertheless, disagree with its ultimate conclusion that the capital expenditure here in issue is currently deductible as a business expense because of the respondent's apparent administrative practice.

Neither the Internal Revenue Code nor the regulations provide any general definition for determining what constitutes research and development costs. Such determination, therefore, must be made in each case upon the particular circumstances involved therein. In some measure, the research and development costs which the Service contemplated were particularized and qualified in terms of such costs in an "experimental or laboratory sense," and related mainly to the constant carrying on of laboratory and research operations. Petitioner points out that it has consistently for many years deducted as business expenses the various costs of operating its laboratory and research facilities, and in particular indicates that it properly so expensed those costs incurred over a period of about 4 years in converting from a grain base to a molasses base in the production of fresh compressed yeast. Petitioner argues that the Best Yeast payments should be treated in the same manner. It should be noted that petitioner has consistently in its accounting deducted currently its research and experimental expenses and that this practice has been allowed by the Commissioner except for such treatment by petitioner of the Best expenditure.

We think that the payments to Best were essentially research and development costs in a laboratory or experimental sense. The con-

tract between petitioner and Best is complex, but in essence it provided that Best make available to petitioner all of Best's knowledge, skills, techniques, formulas, etc., regarding its processes for manufacturing dry yeast and adapt such experience and know-how as Best had acquired in such manufacture to the development of a technique and process for manufacturing dry yeast from petitioner's molasses base compressed yeast product. This was to be accomplished by representatives of the technical staffs of both Best and petitioner meeting together at petitioner's plant in Milwaukee and there engaging in the necessary laboratory and pilot plant research and experimentation. The record indicates that the representatives of both companies met and worked together in accordance with the agreement. They jointly undertook a series of experiments for the production of a compressed yeast suitable for drying and in the dehydration of such yeast to produce an active dry yeast. These experiments were carried on intermittently over a period of approximately 6 weeks over the summer of 1943. After utilization and adaptation of each of the parties' knowledge and skills in respect to the production and drying of yeast, the joint experiments ultimately produced a satisfactory product meeting the Government's standards as tested in accordance with the terms of the contract. On the basis of the foregoing, we think that the Best payments should be considered research and development costs in the laboratory or experimental sense as such terms were employed by Commissioner Dunlap. Accordingly, we think that the expenditure incurred by petitioner for payments to Best Yeast was such as would qualify for deduction as a business expense in accordance with the policy statement of Commissioner Dunlap.

We must, nevertheless, hold for respondent. The statement of policy by Commissioner Dunlap is not in any way binding, absent provision for this view in the Internal Revenue Code or the regulations appropriate to and promulgated thereunder. We need indicate only briefly that under the applicable provisions of the Internal Revenue Code and regulations no election exists with respect to the treatment to be accorded to expenditures which are capital in nature. If challenged by the Commissioner, they must be capitalized. *Gilliam Manufacturing Co.*, 1 B. T. A. 967 (1925); *Hazeltine Corporation, supra; Claude Neon Lights, Inc., supra; Hart-Bartlett-Sturtevant Grain Co., supra.* See also *Goodell-Pratt Co.*, 3 B. T. A. 30 (1925) ; *John F. Canning, supra.*

At one time article 168 of Treasury Regulations 45, 62, and 65, permitted taxpayers incurring expenses of an experimental nature calculated to result in improvement of their facilities or products to elect to deduct such expenses currently from income in the year in which incurred or to capitalize such expenditures. Subsequently, in

*Gilliam Manufacturing, supra,* we held that under the then applicable revenue act a taxpayer had no option to treat expense items as capital or capital expenditures as ordinary and necessary expenses of carrying on a trade or business. In 1926, the Treasury deleted from article 168 of Regulations 69 the previously permitted option. Thereafter, the then Internal Revenue Bureau, nevertheless, permitted taxpayers to deduct expenses incurred in conducting regular and continual research activities. For the most part, the courts, however, have constantly held that experimentation and research expenditures incurred in the development of new processes, formulas, or patents are capital expenditures and that no option exists for the taxpayer to capitalize or expense such items in accordance with its particular established method of accounting period. Ultimately the service policy was publicly stated in the expression by Commissioner Dunlap heretofore discussed.[1]

In view of the long-standing and well-settled position taken by this Court in these respects, we think that, having determined petitioner's expenditure to be capital in nature, we must find that it is not free to deduct such amounts as business expenses. Accordingly, we hold that respondent was justified in capitalizing the payments to Best Yeast.

Petitioner further argues that whatever it acquired from Best was discarded or abandoned within the year of acquisition, and, therefore, that the entire cost is currently deductible "whether the expenditure be designated as expense or capital." *W. B. Harbeson Lumber Co., supra.* Petitioner, however, has not by appropriate pleading raised a claim for loss deduction under section 23 (f) for either of the years 1943 or 1944, and, therefore, such contention is not properly before us. Even if the issue had been properly raised, however, we think its determination would have been controlled by the views expressed *infra* in connection with petitioner's like claim of loss grounded upon abandonment in 1945 or 1946.

As indicated above, petitioner has, by appropriate pleading, raised a similar contention in respect to the taxable years 1945 and 1946. Petitioner argues that if the Best Yeast payments were properly capitalized by respondent and are not deductible as business expenses or otherwise during the years in which incurred, such amounts are nevertheless deductible as a loss in either the taxable year 1945 or 1946, under section 23 (f) of the Internal Revenue Code of 1939. Petitioner's position is that such loss was from discard and abandonment of that for which it made the payments to Best and that such abandonment occurred either in 1945, when sales of active dry yeast to the

---

[1] Certain Congressional action has since been taken in the 1954 Internal Revenue Code, section 174.

Army ceased, or in 1946, when petitioner adapted its process and product to the requirements of the commercial trade.

If the payments to Best were segregable and deductible on the theory of abandonment as items separate and distinct from other capital outlays covering the research and experimental activities of petitioner in relation to the development of a technique and process for manufacture of active dry yeast, the deduction should have been claimed for a year or years not later than 1944. Cf. *Dresser Manufacturing Co.*, 40 B. T. A. 341 (1939). As already indicated, however, petitioner has not raised this issue by appropriate pleading.

Petitioner argues on brief, however, that its development of processes to make active dry yeast, including the payments to Best, was undertaken for the sole purpose of being able to supply active dry yeast to the Army for war purposes; that sales to the Army ceased in 1945, and that when such sales were resumed in 1946, they were on a limited basis. It further argues that, except for the urgency of war conditions, it would have been able to take its time in developing its processes to make active dry yeast, and would never have entered into the contract with Best.

Petitioner further argues on brief as follows:

At the termination of World War II, petitioner, unlike other manufacturers of yeast, was not satisfied to drop the sale of active dry yeast even though the demand from the United States Army ceased. Accordingly, petitioner began selling active dry yeast in commercial channels. The result of such attempts at commercial sale proved unsuccessful, but petitioner still would not give up on the matter of selling active dry yeast in commercial channels, and petitioner's research staff set out to produce an active dry yeast that would be acceptable to the bakers' trade and the housewife. Petitioner then realized that in order for active dry yeast to be sold in commercial channels it would have to have a faster baking quality and a better (longer) shelf life or storage life. Petitioner proceeded to change its processes of making active dry yeast that were in existence at the conclusion of World War II so as to permit the production of active dry yeast that had a faster baking quality and a better (longer) shelf life or storage life, and then experienced such success in commercial sales of active dry yeast that other companies followed its lead in selling active dry yeast to the commercial trade.

We do not think that the events occurring in 1945 or 1946 amounted to an abandonment or gave rise to circumstances warranting a loss deduction. The record establishes that petitioner, in 1942, embarked upon a program of research and experimentation looking to the development and manufacture of an active dry yeast product. The contract with and the payments to Best were incident to and a part of that program. The immediate objective was to manufacture for and sell to the Army an active dry yeast suitable for its purposes. This objective was achieved, but the market for the particular product ceased (as no doubt was anticipated) when war activities ceased. Petitioner continued its program of research and its experiments in

order to develop a product which would meet the requirements of the commercial trade for a faster baking quality and a longer shelf life. The product, however, continued to be active dry yeast. The research program was continuous and developing. It began prior to any of the years here material and has continued to the present day. The Army was an easier customer than the housewife or baker, and when the Army ceased to be a good customer, a process was developed to satisfy the commercial trade. The process developed with Best's representatives differed from that ultimately used to meet Army requirements, and the latter differed from the process used to meet the requirements of the commercial trade. It is our view, however, that the various steps were merely parts of a whole experimental, research, and development program which began with the objective of producing active dry yeast, achieving one of its objectives in selling active dry yeast to the Army and another in adapting the active dry yeast product for sale to the commercial trade. We find nothing in the record which establishes an abandonment of the program at any of these stages and the affirmative evidence appears rather to support a contrary view.

Accordingly, we hold that petitioner is not entitled to deduct the amount of the payments to Best as a loss upon discard or abandonment in either of the years 1945 or 1946, the only years in respect to which such issue was raised by appropriate pleading.

### Deduction for Permeable Groins.

The respondent has determined that of an amount of $19,421.60 deducted by petitioner on its 1944 corporate income tax return as an ordinary and necessary repair expense, $19,253.56 should be capitalized and that such amount should be depreciated over a period of 50 years. Petitioner, in its amended petition, segregated the $19,421.60 amount, previously deducted as a single expenditure without segregation, into four separate elements of cost composed of the following four items: (1) $1,106.43 paid by petitioner to Whitney for certain advice which was not followed; (2) $3,543.61 attributable to the construction of certain drains in the lake bank (and including $275.22 of a total of $1,381.65 paid to Whitney, representing the allocable portion of that amount paid for advice concerning such drains); (3) $1,860.06 representing the expense of constructing a new sewer; and (4) $12,911.50 expended in the construction of two permeable groins. We will consider whether any or all of such cost items were properly capitalized by respondent.

The largest expenditure in issue is that incurred in the actual construction of two permeable groins. Respondent contends that the expenditure was capital in nature. He argues that the permeable groins constituted permanent improvements or betterments having a useful

life of more than 1 year and prolonging the beneficial life of the property so improved.  Petitioner, on the other hand, contends that construction of the permeable groins was a repair made only to keep petitioner's plant in its ordinarily efficient operating condition.  Petitioner argues that the groins did not add to the value of petitioner's property or prolong its useful life.  We hold for respondent for the reasons set out below.

Questions concerning the capital or expense nature of an item have often been before the Court, and though in broad application the legal principles are well settled, it nonetheless remains in each particular case for us to determine whether in the circumstances of that case the expenditure was in fact a repair expense or a capital improvement or betterment, an issue which is frequently a matter of degree.  We think that the construction involved in this case, namely, two permeable groins, was capital in nature.  The groins represented new and permanent construction and had a useful life extending beyond the one year in which the expenditure was incurred.  We think the record indicates that the groins improved and bettered petitioner's property, in some measure successfully stabilizing a portion of petitioner's shore line and building a beach within the immediate area of the groins.  The existence of the groins has also enabled petitioner to construct a new sewer opposite one of them.  Admittedly the groins have only to a degree prevented further erosion of petitioner's lake bank, and obviously have not prolonged the useful life of petitioner's property beyond that for which it would have been useful had no erosion taken place, but we nevertheless think that they have added to the value of petitioner's property for use in its business.  See *Hotel Sulgrave, Inc.*, 21 T. C. 619 (1954), where it was held that installation of a sprinkler system did not represent a repair but was an improvement or betterment which, while it did not increase the value of the hotel property, did render such property more valuable for use in the taxpayer's business, and accordingly, that the cost of such installation was properly added by respondent to petitioner's capital investment in the building and depreciated over the life of the building.  Cf. *Black Hardware Co.*, 16 B. T. A. 551 (1929), affd. (C. A. 5, 1930) 39 F. 2d 460, certiorari denied 282 U. S. 841; *International Building Co.*, 21 B. T. A. 617 (1930) ; *Difco Laboratories, Inc.*, 10 T. C. 660 (1948).

Petitioner argues further, on the basis of *Illinois Merchants Trust Co., Executor*, 4 B. T. A. 103 (1926) and *American Bemberg Corporation*, 10 T. C. 361 (1948), affirmed per curiam (C. A. 6, 1949) 177 F. 2d 200, that the two permeable groins merely restored its property to its ordinarily efficient operating condition and did not otherwise constitute an improvement or betterment in the nature of a capital item. We think that both cases are readily distinguishable on their facts.

In *Illinois Merchants Trust*, a sudden lowering of the water level in the south branch of the Chicago River left the upper ends of certain wood piles upon which the taxpayer's building rested exposed to the air, causing that part of the piles to decay from dry rot. As a consequence, the wall on the river side of the taxpayer's building settled to a point where it was likely that the entire building would collapse. In order to maintain the building in serviceable condition it was necessary to saw off the rotted piles at a point below the new water level and to insert concrete supports between the ends of the submerged piles in the floor of the building, thus raising the river wall. This wall was also considerably shored up. We held that the taxpayer was entitled to deduct the cost of this work as a business expense for repairs. Regarding the distinction between a repair expense and a capital expenditure we said:

In determining whether an expenditure is a capital one or is chargeable against operating income, it is necessary to bear in mind the purpose for which the expenditure was made. To repair is to restore to a sound state or to mend, while a replacement connotes a substitution. A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life. It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired. Expenditures for that purpose are distinguishable from those for replacements, alterations, improvements or additions which prolong the life of the property, increase its value, or make it adaptable to a different use. The one is a maintenance charge, while the others are additions to capital investment which should not be applied against current earnings. * * *

It is clear that in *Illinois Merchants Trust* the expenditure did not prolong the useful life of the building beyond its probable normal life, even though it did extend the life of the building beyond what it would have been had the piles not been repaired. But the critical basis for permitting the taxpayer to deduct the expenditure currently was that there was a restoration of "damaged fabric" in order to keep the property in operating condition and that the work did not represent a complete replacement of any sizable unit or totally new construction such as is involved in the instant case. See *Buckland* v. *United States*, (D. Conn., 1946) 66 F. Supp. 681.

Similarly, *American Bemberg* is also a case of repairs. There several large cave-ins occurred in the taxpayer's plant, caused by the condition of the soil and bedrock. In order to prevent having to abandon the plant, the taxpayer undertook certain drilling and grouting operations. Relying somewhat on *Illinois Merchants Trust*, we held that consideration should be given to the physical nature of the work, the effect of the work undertaken, whether something new was created, and whether the work afforded permanent relief or merely maintained the level of operation of the plant. We concluded in that case that the purpose of the work was to enable the taxpayer

to continue the plant in operation on the same scale as before, and was not to rebuild or replace the plant. We pointed out that neither the drilling nor the grouting was a work of construction nor did it create anything new, and that only the intermediate consequences of the original geological defect had been dealt with. Accordingly, we held that the expenditures were for repairs and were not capital expenditures. Such circumstances obviously are quite different from those of the instant case where there was no damage to petitioner's plant to which the construction of permeable groins related. (In this respect the expenditure was wholly anticipatory.) The construction was entirely new and, as is apparent from the record, did substantially more than merely maintain petitioner's plant in its ordinarily efficient operation.

The second item of expense to be considered is that incurred for construction of a new sewer of 6-inch copper pipe. In large measure for the same reasons heretofore expressed in respect to the groins, we think that the cost of constructing the sewer was a capital expenditure. However, petitioner argues further in respect to this item that the sewer was merely a replacement of one already in existence and therefore that such expenditure should not be considered a capital expenditure. Petitioner urges that it should not be required to capitalize an expenditure for duplicating a facility which was still in existence and which physically was still in usable condition, but which for other causes was not usable. The old sewer apparently was not deteriorated but because of the washing away of the lake bank it could not be moved from its position along the side of the bluff to the location of the present (new) sewer along an end of one permeable groin.

In *Illinois Merchants Trust* we distinguished a repair expense from a capital expenditure by considering expenditures for replacement which prolong the life of property or increase its value as capital expenditures. The expenditure here was such a capital replacement expenditure. There was no restoration of the old facility but construction of a completely new one. It is evident that the distinction between the terms "repair" and "replacement" is one of fine degree. However, we think that a repair involves something more in the nature of a substitution of new parts or restoration of certain parts of a given whole, whereas in the instant case the entire structural unit was replaced and a new one substituted therefor without relation to the original physical facility. See *Russell Box Co.* v. *Commissioner*, (C. A. 1, 1953) 208 F. 2d 452, affirming a Memorandum Opinion of this Court, holding that the cost of constructing a steel fence to provide protection against sabotage and to replace an old wooden fence was a capital expenditure. Cf. *Hoyt B. Wooten*, 12 T. C. 659 (1949), affirmed per curiam (C. A. 6, 1950) 181 F. 2d 502.

We hold that respondent has properly capitalized the expenditure incurred in construction of a new sewer.

The third item in issue is the cost of constructing certain drains in the lake bank adjacent to petitioner's plant. The drains proved unsuccessful and, at a time not disclosed in the record, were washed into the lake. Petitioner argues that the expenditure for drainage did not result in the acquisition of a capital asset and therefore that such amount should be allowed as a deductible expense in 1944 under section 23 (a) of the Internal Revenue Code of 1939. It is our view, based upon consideration of the entire record, that the expense incurred by petitioner for construction of these drains was capital in nature. The drains appear to have had a useful life of more than 1 year and certainly represented new construction as distinguished from the repair or restoration of an existing facility. Also, in some measure, they doubtless increased the value of petitioner's property for the period of their existence. Subsequent destruction or loss of the drains does not in any way reflect on the nature of the original expense. The issue in this respect would have to be drawn in terms of a deduction for loss under section 23 (f) of the Internal Revenue Code. Our examination of the pleadings does not reveal any claim on such basis and the record discloses no evidence from which we might infer such a claim. Consequently, we must sustain the respondent's determination in respect to this item.

The last item in issue is the fee paid to Whitney for certain advice which was not subsequently acted upon by petitioner. Petitioner's contention in respect thereto is essentially the same as that urged in regard to the expenditure for drains, namely, that the payment in question constituted a business expense for the reason that there was no acquisition by petitioner of a capital asset as a consequence of the expenditure and to which the expenditure could properly be attributed.

Petitioner sought advice from both Whitney and Wood in connection with deterioration of the lake bluff. Ultimately petitioner followed some of the recommendations of Whitney and Wood in respect to the construction of drains, but followed only the recommendations of Wood in respect to the construction of permeable groins. Petitioner did not follow or otherwise utilize the recommendation of Whitney respecting the construction of certain stone filters. It is the portion of the fee that is attributable to this latter advice which is now in issue.

We think that while the single same circumstance prompted petitioner to seek the advice of both Whitney and Wood, Whitney's advice concerning construction of stone filters is clearly separable from and has no relation to that advice of Wood concerning the construction of permeable groins. Accordingly, we agree with petitioner that the

expenditure did not result in the acquisition of an asset to which the fee may be attributed as a cost factor. It would obviously not be proper to attribute this fee to the cost of permeable groins since the advice for which the fee was paid had nothing at all to do with construction of permeable groins, except in an extreme causal sense in which it might be considered that both cost factors (and also the cost of drains) related to preservation of the lake bank. This does not seem to us to be a case where the cost of architectural or engineering services is related to construction of some kind and consequently attributable thereto. We think that in the circumstances of this case the amount is properly deductible as a fee for professional services in the year in which it was incurred and is not to be considered as a capital expenditure.

At several points during the course of the hearing and on brief, petitioner appears to contend alternatively that should the $19,421.60 expenditure have been properly capitalized in any amount by respondent depreciation is properly calculable over a lesser period than that of 50 years as determined by respondent. Petitioner offered no proof in respect to this matter, only challenging respondent's expert witness' expertise regarding the probable useful life of permeable groins located in Lake Michigan. And a careful review of the pleadings discloses no assignment of error in regard to this portion of respondent's determination. Accordingly, no such issue is before us and respondent's determination is sustained.

*Decision will be entered under Rule 50.*