*Decisions will be entered under Rule 50.*

CIBA PHARMACEUTICAL PRODUCTS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 45364. Filed November 25, 1960.

*Richard W. Wilson, Esq.,* for the petitioner.
*S. A. Winborne, Esq.,* and *Irene F. Scott, Esq.,* for the respondent.

MULRONEY, *Judge:* The respondent disallowed in part the petitioner's applications for excess profits tax relief under section 722 of the Internal Revenue Code of 1939 [1] for the years 1940 through 1944 and disallowed in full the petitioner's application for relief under section 722 for the year 1945. Respondent allowed the petitioner a constructive average base period net income of $295,000 for the year 1940 and $400,400 for the years 1941 through 1945. In his notice of deficiency and of disallowance (under sections 272 and

[1] All section references are to the Internal Revenue Code of 1939, as amended.

732), the respondent accordingly determined overassessments of excess profits tax and corresponding deficiencies in income tax as follows:

| Year | Overassessment of excess profits tax | Income tax deficiency |
|---|---|---|
| 1940 | $248.07 | (1) |
| 1941 | 19,321.61 | $5,989.69 |
| 1942 | 31,528.38 | 15,569.56 |
| 1943 | 31,528.38 | 15,569.57 |
| 1944 | 33,279.96 | 15,569.56 |
| 1945 | (1) | (1) |

1 None.

Respondent explained that the 80 per cent limitation provided for in section 710(a)(1)(B) precludes any relief for the year 1945 under section 722.

The questions before us are:

(1) Whether the petitioner, under sections 722(a) and 722(b)(4), is entitled to a constructive average base period net income in excess of that allowed by the respondent for the years 1940 through 1945.

(2) Whether the petitioner's average base period net income is an inadequate standard of normal earnings because its business was depressed during the base period by temporary economic circumstances unusual in its case within the meaning of section 722(b)(2).

(3) Whether the petitioner is entitled to a refund of amounts of tax and interest withheld by it in connection with royalty payments made by it in 1944 and 1945 to its parent company, Society of Chemical Industry in Basle, Switzerland, and paid by the petitioner to the respondent.

(4) Whether in computing petitioner's excess profits tax liability the petitioner is entitled to deductions under section 23(p) in the amounts of $100,000 and $97,658 in 1944 and 1945, respectively, for contributions made to an employee's profit-sharing trust.

### FINDINGS OF FACT.

Some of the facts have been stipulated and they are herein incorporated by this reference.

Ciba Pharmaceutical Products, Inc., hereinafter called petitioner, is a corporation organized under the laws of the State of New Jersey on July 15, 1936. Its principal office is in Summit, New Jersey. Its Federal income and excess profits tax returns for the years here involved were filed with the then collector of internal revenue at Newark, New Jersey.

The pharmaceutical industry is divided into two groups, the proprietary and ethical. In the proprietary group the pharmaceutical product is promoted and sold directly to the consumer, while in the ethical group the product is promoted with the medical and allied

professions. Petitioner is in the ethical pharmaceutical group and its method of approach is through the medium of professional service representatives who call personally on physicians, through the medium of direct mail, and through the medium of general advertising, coupled with research done in various institutions.

The Food and Drug Administration decides whether a product is to be sold as an ethical or proprietary medium. It instructs the manufacturer whether a product is to bear a label requiring a prescription or is to be labeled for over-the-counter sale. Some of the petitioner's products are proprietary drugs.

Petitioner commenced operations in May 1937, at which time it occupied a newly constructed industrial plant in Summit, New Jersey. At all times the petitioner kept its books and filed its Federal tax returns on a calendar year basis and on an accrual method of accounting. Petitioner is a wholly owned subsidiary of a Swiss corporation, Society of Chemical Industry in Basle, Switzerland. In 1920 the parent corporation, hereinafter referred to as the Society in Basle, or the Society, organized as a wholly owned subsidiary a New York corporation, Ciba Company, Inc., hereinafter referred to as Ciba of New York. From the date of its organization in 1920, Ciba of New York sold in the United States products manufactured by the Society in Basle and imported by Ciba of New York in finished packages. In 1925 Ciba of New York started to have manufactured for it by independent manufacturers in the United States under United States patents issued or assigned to the Society in Basle, bulk pharmaceutical products which Ciba of New York packaged on its own premises and sold in the United States under trade names owned by the Society in Basle. In addition to the packaging and sale of pharmaceutical products, Ciba of New York also engaged in similar operations with respect to industrial dyes.

On May 21, 1937, Ciba of New York sold inventories of pharmaceutical products to the petitioner at the book value of $170,351.77, and, in addition, the petitioner acquired from Ciba of New York its accounts receivable at book value of $68,123.21, its machinery and equipment at book value of $22,443.58, and its list of pharmaceutical customers at no cost to the petitioner. After this date Ciba of New York engaged in no way in the packaging or sale of pharmaceutical products, and effective May 21, 1937, the Society in Basle terminated its pharmaceutical license agreement with Ciba of New York. Also on this same date, the petitioner employed Hein Kamp as general manager, V. A. Burgher as sales manager and N. F. Storm as production manager, and K. Zimmerman as assistant treasurer and office manager. These individuals were formerly employed by Ciba of New York, and, with the exception of Zimmerman, in similar positions.

On May 24, 1937, the petitioner entered into a "License Agree-

ment" with the Society in Basle granting to petitioner the exclusive right and license to practice the processes and to make, use, or sell the articles, predominantly pharmaceutical in nature, covered by certain United States patents owned by the Society and to use certain of the Society's trademarks (registered in the United States) throughout the United States and its territories and dependencies for an indefinite period of time in return for the payment to the Society of a royalty amounting to 5 per cent of the petitioner's net selling price of the articles or materials sold. The agreement includes schedules showing 59 United States letters patent and 42 United States registered trademarks which are covered by the licensing agreement. The agreement specified, however, that "the term 'the Patents' means not only the patents and applications listed in the annexed schedule but also all other United States patents and applications therefor and improvements therein that may be hereafter issued to or otherwise acquired by licensor for the production or use of pharmaceutical specialties, pharmaceutical chemicals or cosmetic materials or processes."

On October 1, 1939, the "License Agreement" was amended to permit the petitioner to operate under the agreement not only in the United States and its territories and dependencies but throughout the world. This supplemental agreement of October 1, 1939, stated that the "outbreak of war in Europe has made it desirable" to modify the earlier agreement.

Petitioner entered into an agreement with the Society in Basle, effective July 1, 1940, whereby the Society in Basle sold, assigned, and transferred to the petitioner its entire right, title, and interest in its United States trademarks and registrations thereof, together with the goodwill associated with such trademarks, for the sum of $150,000 payable within 30 days after the effective date of the agreement. In the same agreement the Society in Basle sold, assigned, and transferred to the petitioner its entire right, title, and interest in certain United States patents and applications for letters patent, and the petitioner agreed to pay $900,000, payable in half yearly installments of $60,000. The agreement covers approximately 150 patents and applications for letters patent.

On July 1, 1940, petitioner and the Society in Basle entered into a "Research Agreement" under which the Society in Basle agreed to furnish to petitioner all the results of the work of its research departments insofar as they related to pharmaceutical products already manufactured or processes already carried out by the petitioner, as well as all subsequent changes or additional improvements, inventions, and discoveries pertaining to such products. Society in Basle also agreed to furnish to petitioner all information resulting from its research and other laboratories, whether or not the manufacture of the products to which the research work was related was ever carried

out by the petitioner. It was further agreed that if the research conducted by the Society in Basle in the pharmaceutical field resulted in an application for the grant of United States patents, such patent rights were to be assigned to the petitioner at its request. If the petitioner decided to manufacture a new product resulting from research done by the Society in Basle, the petitioner could, under the agreement, require the Society in Basle to assign to it all relevant trademarks. Petitioner agreed to share with the Society in Basle the cost and expenses of the Society's research and other departments, and the petitioner's share was to be determined by the percentage of its net sales of pharmaceutical products to the Society's net sales of pharmaceutical products. The agreement was to continue for a period of at least 20 years.

During the years 1941 through 1945 the petitioner accrued on its books and records royalties payable to the Society in Basle in the amount of $166,641.48. In 1944 the petitioner paid to the Society in Basle royalties of $107,851.64 less the amount of $32,355.50, which was the tax actually withheld by petitioner as withholding agent. In 1945 the petitioner paid to the Society in Basle royalties of $34,105.14 less the amount of $1,067.10, which was the tax actually withheld by petitioner as withholding agent.

On July 28, 1938, the petitioner executed a contract for the construction of a physiological laboratory and animal house in Summit, New Jersey, and these buildings were completed in the early part of 1939. On December 15, 1939, the petitioner executed a contract for the construction of extensions to buildings C and D of petitioner's plant in Summit. These extensions, which were completed and made available to the petitioner in September 1940, are known as buildings CX and DX. Late in 1939 or in the early part of 1940 machinery and equipment were installed in building CX for the production of the synthetic hormones, Percorten, Perandren, Metandren, and Lutocyclin.

On June 13, 1939, the United States Patent Office issued to the Society in Basle a patent (No. 2,161,938) for Napthasolene, a vasoconstrictor. This patent, together with Patent No. 2,149,473 (issued to the Society on March 7, 1939), covering the same general product, was included among the numerous other United States patents assigned to the petitioner on July 1, 1940. On October 10, 1940, and January 7, 1941, the Society sent batches of this product to the petitioner for investigation purposes. Petitioner conducted research to find a more satisfactory form of the product, finally developing and marketing the product under the trade name Privine in a hypochloride form. On January 28, 1941, the Society in Basle, in a letter to the petitioner, stated that a preparation 2020r would be placed on the market early that spring under the name of "Privin" in one or several

pilot countries, and further stated that the essential physical and chemical data on this substance was being forwarded to the petitioner with the letter, in addition to the pharmacological data which had already been forwarded to the petitioner on May 4, 1940. The Society in Basle also stated in the letter that, "At the present time the laboratory scale method will be forwarded." As originally compounded by the Society, the product, Privine, was in an acetate form. Equipment for the production of Privine was installed in petitioner's Summit building CX sometime late in 1941, and the first production of Privine as a bulk drug by the petitioner in its own facilities was in the fall of 1942. Privine was approved by the Food and Drug Administration on October 9, 1942.

The total of net sales and the total of comparative net income [2] of seven leading manufacturers of prescription-type pharmaceutical products (Abbott Laboratories, Eli Lilly & Co., Merck & Co., Inc., Parke Davis & Co., Charles Pfizer & Co., Inc., E. R. Squibb & Son, and the Upjohn Co.) for the years 1935 through 1946, were as follows:

| Year | Net sales | Comparative net income |
|------|-----------|------------------------|
| 1935 | $90, 070, 525 | $21, 599, 975 |
| 1936 | 99, 058, 393 | 23, 538, 658 |
| 1937 | 108, 588, 933 | 25, 513, 452 |
| 1938 | 108, 524, 479 | 24, 645, 122 |
| 1939 | 122, 958, 035 | 29, 781, 482 |
| 1940 | 136, 137, 946 | 34, 970, 975 |
| 1941 | 185, 412, 699 | 49, 997, 101 |
| 1942 | 211, 562, 413 | 57, 124, 707 |
| 1943 | 280, 587, 175 | 83, 752, 966 |
| 1944 | 295, 569, 586 | 80, 414, 923 |
| 1945 | 312, 784, 960 | 74, 269, 894 |
| 1946 | 382, 140, 958 | 104, 686, 118 |

The quantity and value of synthetic medicinal sales in the United States during the period 1936 through 1947 were as follows:

| Year | Quantity (1,000 lbs.) | Value ($1,000) | Unit value (dollars) |
|------|-----------------------|----------------|----------------------|
| 1936 | 11, 284 | 11, 642 | 1. 03 |
| 1937 | 13, 431 | 13, 904 | 1. 04 |
| 1938 | 10, 022 | 11, 787 | 1. 18 |
| 1939 | 14, 415 | 19, 831 | 1. 38 |
| 1940 | 16, 737 | 25, 361 | 1. 52 |
| 1941 | 29, 024 | 58, 767 | 2. 02 |
| 1942 | 36, 739 | 83, 448 | 2. 27 |
| 1943 | 51, 803 | 139, 639 | 2. 70 |
| 1944 | 36, 212 | 111, 794 | 3. 09 |
| 1945 | 40, 025 | 160, 972 | 4. 02 |
| 1946 | 40, 402 | 218, 336 | 5. 40 |
| 1947 | 41, 587 | 233, 246 | 5. 61 |

The following schedule shows petitioner's sales by products, indicating those products which had previously been sold by Ciba of New York and indicating the year of the first sales by the petitioner of products which had not been previously sold by Ciba of New York:

[2] Net income with certain adjustments such as exclusion of (1) domestic dividends, (2) capital gain (or loss), (3) all interest on Federal, State, and municipal obligations. It is a close approximation to base period excess profits net income.

**Products taken over from Ciba—New York:**

*1937 sales*

| Product | Trademark issued | 5-21-37 to 12-31-37 | 12-31-38 | 12-31-39 | 12-31-40 | 12-31-41 | 12-31-42 | 12-31-43 | 12-31-44 | 12-31-45 |
|---|---|---|---|---|---|---|---|---|---|---|
| Coramine | 1924 | $192,976 | $389,878 | $420,599 | $483,485 | $509,379 | $486,749 | $537,958 | $589,672 | $669,235 |
| Nupercaine | 1930 | 15,496 | 26,624 | 28,430 | 34,373 | 48,955 | 32,010 | 36,408 | 39,438 | 40,161 |
| Nupercainal | 1934 | 140,022 | 254,299 | 277,747 | 297,270 | 345,172 | 379,368 | 457,440 | 507,703 | 606,896 |
| Trasentine | 1936 | 15,551 | 74,029 | 111,599 | 112,650 | 120,032 | 112,460 | 121,850 | 148,201 | 171,335 |
| Perandren | 1936 | 11,721 | 172,212 | 377,218 | 347,006 | 324,698 | 326,041 | 408,739 | 610,747 | 785,076 |
| Agomen | 1915 | 33,094 | 46,445 | 38,617 | 33,495 | 28,529 | 25,812 | 30,323 | 27,940 | 29,238 |
| Androstine | | 25,115 | 42,005 | 30,993 | 17,788 | 12,298 | 9,802 | 9,608 | 8,458 | 9,038 |
| Cibalgine | 1925 | 20,040 | 31,401 | 25,989 | 25,311 | 26,725 | 26,131 | 34,699 | 35,059 | 38,559 |
| Dial-Ciba | 1919 | 28,330 | 42,876 | 33,446 | 28,909 | 26,185 | 22,548 | 25,020 | 24,458 | 23,599 |
| Digifoline | 1914 | 111,984 | 180,603 | 175,346 | 179,479 | 208,754 | 172,630 | 182,672 | 182,901 | 183,737 |
| Lipiodine | 1911 | 21,757 | 31,636 | 29,286 | 30,317 | 33,938 | 38,907 | 45,109 | 49,816 | 57,928 |
| Sistomen | 1915 | 35,359 | 52,051 | 42,925 | 34,067 | 30,578 | 25,319 | 28,398 | 29,049 | 29,133 |
| Coagulen | 1914 | 5,940 | 8,258 | 8,570 | 7,983 | 7,654 | 8,357 | 8,553 | 9,850 | 11,641 |
| Isarol | 1914 | 4,573 | 6,593 | 7,799 | 6,211 | 14,575 | 20,443 | 20,019 | 10,640 | 10,640 |
| Lipojodine Diag | | 2,016 | 3,120 | 2,747 | 2,371 | 3,072 | 2,650 | 2,687 | 2,863 | 2,618 |
| Persistaline | 1912 | 3,521 | 5,552 | 5,316 | 4,174 | 3,921 | 3,255 | 4,000 | 5,232 | 7,589 |
| Phytin | 1905 | (a) | 4,154 | 4,976 | 3,716 | 4,830 | 4,428 | 5,501 | 4,307 | 5,585 |
| Resyl | 1933 | (a) | 8,589 | 6,443 | 4,504 | 3,737 | 3,451 | 4,496 | 12,863 | 3,453 |
| Vioform | 1913 | (a) | 8,273 | 8,624 | 9,018 | 24,996 | 11,928 | 31,356 | 52,292 | 59,188 |
| Atoquinol | 1921 | (a) | | | | | | | | |
| Ferrophytine | 1914 | (a) | 143 | 1,272 | | | 292 | 504 | 262 | 569 |
| Prokliman | 1938 | (a) | 1,831 | | | | | | | |
| Siosan | 1922 | (a) | 2,617 | 2,553 | 2,540 | 2,837 | 2,964 | 3,878 | 3,605 | 1,229 |
| Kryofine | 1918 | (a) | 1,115 | 469 | 300 | 286 | 203 | 381 | 209 | 103 |
| Miscellaneous | | (a)21,222 | 339 | 635 | See below | | 24,488 | | | |
| Total | | 688,717 | 1,395,843 | 1,641,499 | 1,664,970 | 1,781,151 | 1,741,245 | 2,000,499 | 2,355,465 | 2,737,550 |

**Products introduced and sold in 1938:**

| Product | Trademark issued | 5-21-37 to 12-31-37 | 12-31-38 | 12-31-39 | 12-31-40 | 12-31-41 | 12-31-42 | 12-31-43 | 12-31-44 | 12-31-45 |
|---|---|---|---|---|---|---|---|---|---|---|
| Esidrone | 1937 | | 2,552 | 6,578 | 0 | | | 78 | 191 | |
| Fortossan | 1905 | | 100 | 0 | | | | | | |

**Products introduced and sold in 1939:**

| Product | Trademark issued | 5-21-37 to 12-31-37 | 12-31-38 | 12-31-39 | 12-31-40 | 12-31-41 | 12-31-42 | 12-31-43 | 12-31-44 | 12-31-45 |
|---|---|---|---|---|---|---|---|---|---|---|
| Ovocylin | 1938 | | | | 23,208 | 30,179 | 12,147 | 15,287 | 17,783 | 22,060 |
| Ben-ovocylin | 1939 | | | | 5,357 | 9,489 | 7,343 | 13,229 | 16,650 | 23,297 |
| Di-ovocylin | 1939 | | | | 72,305 | 96,053 | 66,499 | 92,136 | 132,267 | 176,685 |
| Lutocylin | 1938 | | | | 6,495 | 11,180 | 7,634 | 12,284 | | 11,436 |
| Percorten | 1938 | | | | 20,871 | 22,841 | 21,646 | 32,012 | 38,754 | 40,834 |
| Piferazine | | | | | 0 | | | | | |
| Total 1939 product | | | | | 128,286 | 169,742 | 115,269 | 164,948 | 219,401 | 274,312 |

| | Trademark issued | 5-21-37 to 12-31-37 | 12-31-38 | 13-31-39 | 12-31-40 | 12-31-41 | 12-31-42 | 12-31-43 | 12-31-44 | 12-31-45 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Products introduced and sold in 1940:** | | | | | | | | | | |
| Sulfathiazole | | | | | 49,796 | 29,014 | 30,726 | 54,386 | 18,796 | 15,784 |
| Total | | 688,717 | 1,398,495 | 1,694,546 | 1,843,002 | 1,979,907 | 1,887,240 | 2,219,861 | 2,503,853 | 3,027,646 |
| **Products introduced and sold in 1941:** | | | | | | | | | | |
| Metandren | | | | | | 103,179 | 107,721 | 165,017 | 420,039 | 700,097 |
| Nuporals | | | | | | 21,712 | 33,422 | 53,289 | 56,019 | 46,725 |
| Lutocylol | | | | | | 4,015 | 8,007 | 7,972 | 13,703 | 30,775 |
| Total 1941 products | | | | | | 128,906 | 149,150 | 226,278 | 489,761 | 777,597 |
| **Products introduced and sold in 1942:** | | | | | | | | | | |
| Privine | | | | | | | 10,377 | 425,237 | 888,968 | 1,341,228 |
| Trasentine-Phenobarbitol | | | | | | | 21,700 | 115,478 | 229,235 | 339,376 |
| Sulfadiazine | | | | | | | | | | |
| Biotose (1922) | | | | | | | 45,570 | 52,850 | 47,362 | 29,854 |
| Diethylstibesterol | | | | | | | 266 | 473 | 507 | 187 |
| Total 1942 products | | | | | | | 77,913 | 594,038 | 1,166,072 | 1,710,645 |
| **Products introduced and sold in 1944:** | | | | | | | | | | |
| Sulfadiazine | | | | | | | | | (1) | (1) |
| **Products introduced and sold in 1945:** | | | | | | | | | | |
| Sulfanilimide | | | | | | | | | | 25 |
| Sulfapiridine | | | | | | | | | | 160 |
| Sulfagunmidine | | | | | | | | | | 0 |
| Miscellaneous | | | | | (1,049) | 1,771 | | 46,758 | 25,471 | 2 120,299 |
| Trade discounts and unidentified | | | 811 | 910 | (1,534) | (1,872) | (3,009) | (3,081) | (3,572) | (3,961) |
| **Net sales—domestic:** | | | | | | | | | | |
| Excluding Gov't. sales | | 688,717 | 1,399,306 | 1,695,456 | 1,840,419 | 2,108,712 | 2,111,294 | 3,083,854 | 4,271,535 | 5,632,411 |
| Government sales | | 0 | 0 | 0 | 0 | 0 | 512,787 | 716,916 | 479,356 | 250,327 |
| Export sales | | 0 | 0 | 48,789 | 183,629 | 544,466 | 681,742 | 1,134,132 | 1,247,755 | 1,832,226 |
| Net sales | | 688,717 | 1,399,306 | 1,744,245 | 2,024,048 | 2,653,178 | 3,305,823 | 4,934,902 | 5,998,696 | 7,714,964 |

1 In Misc.

2 Note: This figure includes $108,371 of Estradiol Benzoate shipped to France under Lend-Lease.

The following schedule shows petitioner's *ratio* of cost of goods to sales in each of several categories for the period May 21, 1937, through December 31, 1945:

| Year | Domestic sales excluding Government sales | Government sales | Export sales | Total sales |
|---|---|---|---|---|
| | *Per cent* | | | |
| May 21 to Dec. 31, 1937 | 22.3 | | | 22.3 |
| 1938 | 22.4 | | | 22.4 |
| 1939 | 20.5 | | 82.0 | 22.3 |
| 1940 | 21.8 | | 51.0 | 24.5 |
| 1941 | 21.4 | | 41.1 | 25.4 |
| 1942 | 18.6 | 65.7 | 38.6 | 30.0 |
| 1943 | 19.9 | 73.2 | 38.5 | 31.9 |
| 1944 | 17.8 | 76.0 | 74.1 | 34.2 |
| 1945 | 17.3 | 81.8 | 56.7 | 28.8 |

The petitioner's net income, after adjustments made by the respondent, for the period from May 21, 1937, through December 31, 1945, was as follows:

| Year | Net income | Year | Net income |
|---|---|---|---|
| May 21 to Dec. 31, 1937 | $58,471 | 1942 | $548,555 |
| 1938 | 253,407 | 1943 | 1,204,663 |
| 1939 | 359,463 | 1944 | 1,536,742 |
| 1940 | 415,265 | 1945 | 2,459,325 |
| 1941 | 482,573 | | |

The ratios of petitioner's advertising costs to net sales for the base period years were as follows:

| Date | Net sales | Advertising expenses | Ratio to sales |
|---|---|---|---|
| | | | *Per cent* |
| May 21 to Dec. 31, 1937 | $688,717 | $244,615 | 35.5 |
| 1938 | 1,399,306 | 481,560 | 34.4 |
| 1939 | 1,744,245 | 502,759 | 28.8 |

It is stipulated that petitioner's average base period net income under the growth formula of section 713 (f) is $294,130 for the year 1940 and $359,463 for each of the years 1941, 1942, and 1943.

In computing the excess profits tax credit, based upon a constructive average base period net income, for the year 1940, the respondent applied the variable credit rule and computed constructive sales on the following products in the total amount of $1,859,192 for the year 1939:

| | |
|---|---|
| Coramine | Agomen |
| Nupercaine | Androstine |
| Nupercainal | Cibalgine |
| Trasentine | Dial-ciba |
| Perandren | Digifoline |

Lipoiodine
Sistomen
Coagulen
Isarol
Lipoiodine Diagnostic
Persistaline
Phytin
Resyl (or Resil)
Vioform
Prokliman

Silosan
Kryofine
Esidrone
Ovocylin
Ben-Ovocylin
Di-Ovocylin
Lutocylin
Percorten
Piferanzine

In computing the excess profits tax credit, based upon a constructive average base period net income, for the years 1941 through 1944, the respondent computed constructive sales on the following products in the total amount of $2,070,919 for the year 1939:

Coramine
Nupercaine
Nupercainal
Trasentine
Perandren
Agomen
Androstine
Cibalgine
Dial-ciba
Digifoline
Lipoiodine
Sistomen
Coagulen
Isarol
Lipoiodine Diagnostic
Persistaline

Phytin
Resyl (or Resil)
Vioform
Prokliman
Silosan
Kryofine
Esidrone
Ovocylin
Ben-Ovocylin
Di-Ovocylin
Lutocylin
Percorten
Piferanzine
Metandren
Lutocylol

On December 28, 1944, the petitioner executed an instrument entitled "Ciba Summit Employees Provident Benefit Fund." The instrument provided, in part, as follows:

### A. *Company Contributions.*

\*      \*      \*      \*      \*      \*      \*

2. There shall be forthwith payable by the company to the trustee out of the net profits of the company for the calendar year 1944 the sum of $100,000. Upon each succeeding December 28 there shall be payable by the company to the trustee out of the net profits of the company for that calendar year a sum which to the extent of such net profits shall be not less (but may by authorization of the board of directors of the company in their discretion be more) than 5% of the aggregate compensation of employees of the company participating in that year in the Plan; provided that the total contribution paid by the company to the trustee for any year shall not be greater than shall be allowable under then applicable federal tax laws as a deduction from the company's net income for that year subject to federal income and excess profits taxes.

### B. *Participation in the Plan.*

3. All persons in the full time employ of the company on the date of this agreement or on any subsequent December 28 who shall then have completed twelve

months of continuous service with the company and shall then be current participants in the company's Retirement Annuity and Insurance plans shall be eligible to participate in the benefits of the Plan. * * *

*      *      *      *      *      *      *

*THIRTEENTH:*

*      *      *      *      *      *      *

The Plan including this trust agreement shall be forthwith submitted by the company to the Commissioner of Internal Revenue for approval by him under each of sections 165(a) and 23(p)(1)(c) of the Internal Revenue Code as entitling the company to deduct its contributions under the Plan as exempt contributions. Pending such approval the trustee shall receive no further contributions into the trust fund and shall make no investments thereof or payments therefrom. If the Commissioner of Internal Revenue shall fail to give approval as aforesaid before June 30, 1945 this agreement shall be void and no rights of any employee of the company shall vest and the trustee shall pay over to the company the sum of $100,000 (less the reasonable charges and expenses of the trustee) and shall thereupon be released and discharged as trustee.

On May 29, 1945, the plan was modified by eliminating section A2 and substituting the following:

2. (a) *Base Contribution.* On December 28, 1944 and on each succeeding December 28 there shall be payable by the company to the trustee out of the net profits for the current calendar year a sum (the "base contribution") which to the extent of such net profits shall be 5% of the aggregate compensation of employees of the company participating in that year in the Plan.

(b) *Supplemental Contribution.* In addition to the sum so payable on any December 28 there may at the same time at the company's election be paid by the company to the trustee out of the net profits for the current calendar year any such further sum (the "supplemental contribution") as shall have been authorized by the board of directors of the company in their discretion; provided that no supplemental contribution shall be payable by the company to the trustee or if so paid shall be subject to the vesting of any rights of any employee or to any application or distribution under the Plan unless and until finally determined as hereinafter provided to be allowable under the then applicable federal tax laws as a deduction from the company's net income for that year subject to federal income and excess profits taxes.

(c) For all purposes of the Plan and this agreement a supplemental contribution shall be "finally determined" to be so allowable as a deduction (i) if and when determined to be so allowable upon examination or audit of the income and excess profits tax returns of the company for that year by the Internal Revenue department or (ii) if and when not determined to be not so allowable as a deduction by the Commissioner within the period allowed under the Internal Revenue Code for the assessment of a deficiency of income or excess profits tax for the relative year or (iii) if and when determined to be so allowable as a deduction by the decision or judgment of any court or bureau or tribunal of competent jurisdiction from which either no appeal is permitted by law or no appeal has been taken within the time allowed therefor by law or (iv) if and when refund shall be made to the company for the amount of the tax deficiency paid by the company and attributable to the Commissioner of Internal Revenue's disallowance of the supplemental contribution.

(d) For all purposes of the Plan and this agreement a supplemental contribution shall be "finally determined" to be not so allowable whenever disallowed by decision or judgment of any court or bureau or tribunal or official of competent jurisdiction from which either no appeal is permitted by law or no appeal has been taken within the time allowed therefor by law.

(e) The company will promptly give written notice to the trustee whenever any supplemental contribution shall have been finally determined to be so allowable or to be not so allowable; and any such notice to the effect that a supplemental contribution has been finally determined to be not so allowable shall be accompanied by a certified copy or transcript of the relative judgment or decision and shall certify either that no appeal therefrom is permitted by law or that no appeal therefrom has been taken within the period allowed therefor by law.

(f) The committee hereinafter mentioned shall not direct the trustee to invest any supplemental contribution wholly or partly in any life insurance policy or annuity contract or to make any distribution therefrom unless and until the supplemental contribution shall have been finally determined to be so allowable as a deduction. Whenever the trustee shall have been notified as above provided that a supplemental contribution has been finally determined to be not so allowable as a deduction the amount of the supplemental contribution (less the reasonable charges and expenses of the trustee) shall be repaid by the trustee to the company and the trustee shall thereupon be released and discharged from liability or accountability therefor.

(g) For the calendar year 1944 the base contribution payable by the company to the trustee is $42,720.41 and the supplemental contribution which has been authorized by the board of directors in their discretion and which the company elects to pay to the trustee is $57,279.59.

Also on May 29, 1945, section Thirteenth of the original plan was amended to read, in part, as follows:

Whenever the trustee shall have been notified as provided in section 2 of the Plan that a supplemental contribution has been finally determined to be not allowable under the then applicable federal tax laws as a deduction from the company's net income for that year subject to federal income and excess profits taxes the amount of the supplemental contribution (less the reasonable charges and expenses of the trustee) shall be repaid by the trustee to the company and the trustee shall thereupon be released and discharged from liability or accountability therefor.

On December 28, 1944, the petitioner deposited $100,000 with the Bank of Manhattan Company for the account of the trustee named under the plan, and on December 26, 1945, the petitioner deposited $150,000 under the plan with the City Bank Farmers Trust Company.

Respondent disallowed petitioner's claim for a deduction under section 23(p) in the amount of $100,000 for 1944 and $97,658 for 1945. Respondent allowed the balance of the $150,000 payment in 1945 as a deduction under section 23(p).

In 1944 the petitioner paid to the Society in Basle royalties of $107,851.64 less the amount of $32,355.50, which was the tax actually withheld by petitioner as withholding agent. Petitioner subsequently

paid this amount of income tax ($32,355.50) plus interest in the amount of $9,301.10.

In 1945 the petitioner paid to the Society in Basle royalties of $34,105.14 less $1,067.10, which was the income tax actually withheld by the petitioner as withholding agent. Petitioner subsequently paid income tax in the amount of $10,231.54 plus interest of $3,140.80 with respect to the 1945 royalties paid to the Society in Basle.

On July 8, 1952, the petitioner filed claims for refund in income tax for the amounts of $41,656.60 and $13,372.34 which it had paid as withholding agent for the years 1944 and 1945, respectively. On the same date the petitioner filed claims for refund in excess profits tax, based in part upon its payments of the amounts of $100,000 and $97,658 for the years 1944 and 1945, respectively, alleging that the respondent had improperly disallowed these amounts as deductions under section 23 (p) in computing the petitioner's excess profits tax liability for those years.

### OPINION.

The 722(b)(2) issue was raised by the pleadings but it is not argued by petitioner and there was no evidence introduced that supports it. Petitioner is not entitled to relief under said section.

Respondent agrees that the petitioner qualifies for excess profits tax relief under section 722(b)(4) both by reason of commencing business during the base period and by reason of a change in the character of its business during the base period. Respondent admits petitioner was committed during the base period to increase its capacity for production, and he has allowed partial relief to the petitioner. Respondent, however, does not agree that the petitioner's commencement of export sales in late 1939 and its commencement of the sale of Privine in August 1942 as a result of a course of action to which petitioner was purportedly committed prior to January 1, 1940, are to be recognized in a reconstruction of petitioner's sales for a constructive average base period net income. Consequently, in computing a constructive average base period net income of $295,000 for 1940 and $400,400 for 1941 through 1945, the respondent gave no consideration to these two items. Petitioner argues on brief that its constructive average base period net income should be not less than $850,000.

It is stipulated petitioner's average base period net income under the growth formula of section 713(f) is $359,463. Petitioner argues that this figure does not give effect to an adjustment that should be made for an abnormal expense item paid in 1939. The item was for expenses, called advertising expenses, in the amount of $84,853.16, in connection with displays at two World's Fairs. It is petitioner's contention that this item paid in 1939 is abnormal within the meaning of section 722 and this should be added to the $359,463 to make what

petitioner calls the "corrected figure" representing petitioner's average base period net income under section 713(f) of $444,316, which is in excess of the amounts respondent determined as petitioner's constructive average base period net income for the years involved ($295,000 for 1940 and $400,400 for 1941 through 1945).

There is no merit in petitioner's argument. Without determining the abnormality of the expense item, it is clear petitioner cannot use anything but actual net income in starting its computation under section 713(f). The average base period net income that is to be computed under section 713(f) is based on actual income during base years and not one that is reconstructed under section 722. *Stimson Mill Co.*, 7 T.C. 1065; *Homer Laughlin China Co.*, 7 T.C. 1325.

As stated earlier, petitioner's qualification for relief under section 722(b)(4) is conceded and it is not necessary to decide whether or not it would be qualified under that section because of a commitment to manufacture Privine. However, its manufacture of Privine is to be considered in determining constructive earnings in the base period if the facts show that under the 2-year push-back rule Privine would have been manufactured and sold during the base period. Petitioner has failed to show there was any possibility of any such sales.

Petitioner neither manufactured nor sold any Privine prior to August 1942. The Society obtained United States patents for this product in 1939 but there is nothing to show any license granted to petitioner to manufacture and sell Privine until July 1, 1940, when petitioner acquired all of Society's patents, including two covering Privine. As for the research on the product, the petitioner's own witness admitted that "we must have first started in 1940 to do research of our own." The evidence indicates that samples of the product were sent by the parent to the petitioner in October 1940, apparently for research purposes, and we cannot find from the record that any prior batches were sent to the petitioner.

Petitioner argues it lacked the capacity to manufacture Privine until its building CX (under construction in 1939) to house the machinery and equipment was completed. There is no evidence in the record to show that the petitioner lacked such capacity, or that the new building was even intended for the manufacture of Privine. The planned building, as shown by this record, was a building for the manufacture of synthetic hormones. The contract for this building was executed on December 15, 1939, and the building was completed in September 1940. Petitioner's engineer testified that the machinery and equipment he helped to install in the new building "was for the production of synthetic hormones." We have also examined the detailed plans and flow sheets which indicate the layout of the new building, and there is nothing to indicate that the petitioner planned any part of the new building with Privine in mind. In fact, the

equipment for the manufacture of this product was not installed in building CX until late in 1941, and there is evidence in the record that it was not until January 1941 that the petitioner first received from its parent corporation the laboratory scale method for producing Privine. Also, the petitioner had to conduct research on the product so that it could be marketed in a more satisfactory chemical form, and, as stated earlier, first production of Privine was not until the fall of 1942. All of this evidence indicates that the petitioner, at the end of the base period, not only had no plans of any kind to manufacture Privine in building CX or anywhere else, but also did not know what machinery and equipment was needed to manufacture the product. Petitioner has failed to show that under the 2-year push-back rule Privine would have been manufactured and sold during the base period. Respondent was correct in not considering sales of Privine in the reconstruction of petitioner's base period net income.

Petitioner contends that its export sales, which were commenced late in 1939, should be included as a part of the change in the character of its business during the base period and that such export sales should be considered in any reconstruction of base period net income. Respondent refused to recognize export sales as a factor under section 722 (b) (4) on the ground that they "resulted from war-time economics and under no circumstances could they be reconstructed as being normal under base period conditions." On October 1, 1939, the petitioner and its parent corporation in Switzerland executed a supplemental agreement which stated unequivocally that the "outbreak of war in Europe * * * made it desirable" that the original license agreement of May 24, 1937, be modified to permit the petitioner to operate not only in the United States but throughout the world. Prior to 1939 the petitioner had no export sales and in the years 1939, 1940, and 1941 its export sales were $48,789, $183,629, and $544,466, respectively. We do not believe that any reconstruction of normal base period earnings can include such war sales. *Watt & Shand*, 30 T.C. 809; *Avey Drilling Machine Co.*, 16 T.C. 1281. In *Fezandie & Sperrle, Inc.*, 5 T.C. 1185, the taxpayer, at the very close of the base period, entered the foreign export business as foreign selling agent of a worldwide chemical cartel for color and dye products produced under certain cartel patents, and the only reason for the petitioner's designation as foreign selling agent was the outbreak of hostilities. Taxpayer sought to reconstruct its base period earnings under section 722(b) (4) premised upon this change in its business, and this Court denied relief, saying that the "very profits which it was the intention of Congress to recapture in substantial part would then escape the excess profits tax on the ground that its application to them would be inequitable." We think the rationale of that case is appropriate here.

In order to qualify for excess profits tax relief under section 722 the petitioner must also establish "what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income." Sec. 722(a). Respondent granted partial relief to the petitioner, allowing it a constructive average base period net income of $295,000 for 1940 and $400,400 for 1941 through 1945. Petitioner has failed to show that "a fair and just amount" to which it is entitled would exceed the amount computed by the respondent. All of the petitioner's products are covered by its claims for relief under section 722, but in its reconstruction it emphasized the growth in base period sales of some 13 products.[3] We have carefully examined the reconstructions presented by the petitioner and find that they are unsupported by any evidence. None of the witnesses at the trial testified as to reconstructed sales, or offered any testimony or other evidence which would support the petitioner's reconstructions which, as petitioner admits in its brief, "are undoubtedly tinged with optimism." Petitioner's reconstructions are largely based upon general statements and rather broad assumptions and not upon evidence. We said in *Hanover Canning Co.*, 26 T.C. 1115, 1123, "While the computation appears to be mathematically accurate, it is of little or no value for the purposes here, because of lack of proof of the basic facts from which the various factors were derived."

Many defects appear in the petitioner's reconstruction but it is not necessary to go into all of them to demonstrate its unreliability. Petitioner compares its sales during the base period with those of the pharmaceutical industry and industry in general, and also makes some earnings comparisons during the base period, to demonstrate that "petitioner was doing better than its industry, and its industry was doing better than business in general." However, petitioner takes its sales and earnings figures from May 21 to December 31, 1937, without putting them on an annual basis and compares them with the figures of the other industrial groups which are on an annual basis. A comparison of this sort gives a distorted view of events over the whole base period, and it gives an impression of dynamic growth by the petitioner which is misleading. It is especially imperative in petitioner's case to annualize the figures for 1937 because when petitioner commenced operations in May 1937 it took over the customer lists, key managerial personnel, and an inventory of established pharmaceutical products from Ciba of New York which had been established by the Society in Basle in 1920.

Post-base-period happenings, except in the case of a commitment, are not to be considered in the reconstruction of base period earnings.

---

[3] Perandren, Coramine, Trasentine, Nupercaine, Nupercainal, Ovocylin, Ben-Ovocylin, Di-Ovocylin, Lutocylin, Percorten, Metandren, Lutocylol, and Privine.

But even if such happenings are considered in this case they do not advance petitioner's cause as is disclosed from time to time in the discussion following this paragraph. Cf. *Midvale Co.*, 19 T.C. 1216.

Petitioner reconstructs its total domestic sales by the end of 1939 under the 2-year push-back rule in the amount of $2,711,796 and yet the stipulated exhibits show that petitioner did not reach this level of sales until 1943, some 4 years after the end of the base period, with all the attendant benefits of a wartime economy.[4] We have examined the reconstructed sales figures of individual products and we cannot find that the reconstructions are supported by the record. Petitioner's actual sales of Coramine in 1939 were $420,599 and petitioner reconstructed this as $678,000. An analysis of the quarterly sales of this product for the years 1938 and 1939 shows marked stability, indicating that sales for this product had reached a normal level by the end of the base period, and there is nothing in the record to show that with an additional 2 years' experience the sales of this product would grow so dramatically. An examination of the sales figures for Perandren (actual 1939 sales, $377,218—reconstructed 1939 sales, $562,000) again convinces us that by the end of the base period this product had reached a rather normal sales level. Nothing in the record supports the optimism of petitioner's reconstructed figure. It is significant also that the petitioner's actual sales of Perandren for 1940, 1941, and 1942 were less than the actual 1939 level. It would serve no useful purpose to go through the reconstruction of sales for each product. The two products mentioned by us represent two of the more important ones in terms of sales, and we are not persuaded that the reconstructed sales for them are warranted. In short, while some growth is evident and while we are convinced that under a 2-year push-back the petitioner would have reached a higher sales level by the end of the base period than it actually did, the petitioner has not shown to our satisfaction that the reconstructed level would exceed the respondent's constructive sales figures.

Petitioner's reconstructed cost of goods sold and expenditures for 1939 are equally defective. The cost of goods sold reconstruction is almost entirely based upon facts which are not in the record and upon conjectures which are not supported by any evidence. Similarly the reconstructed expenditures are based upon sweeping statements, generalities, and assumptions which are not established by the record. We have no testimony on these matters, nor any other evidence which is capable of lifting these reconstructions out of the realm of guesswork. See *Industrial Supplies, Inc.*, 18 T.C. 1067, 1075.

---

[4] Respondent, in arriving at the credit based on constructive average base period net income to be used for the years 1941 through 1944, computed constructive sales for 1939 in the amount of $2,070,919.

Finally, we should point out the unreasonableness of the petitioner's reconstructed net income of $1,064,684 for 1939, which is 32.7 per cent of its total reconstructed sales. In 1939 the petitioner's net income was 20.61 per cent of its net sales; and the record herein does not justify a net income that would be 32.7 per cent of sales.

We hold that the petitioner has failed to show that it is entitled to any excess profits tax relief under section 722 in excess of the partial relief granted by the respondent.

The next issue involves the petitioner's contention that, as withholding agent, it incorrectly withheld and paid taxes on certain royalties paid by it to its parent in the years 1944 and 1945. In 1944 the petitioner withheld as tax the amount of $32,355.50 from a royalty payment to its foreign parent, and in 1945 the petitioner withheld as tax $1,067.10 from a royalty payment to its foreign parent. Subsequently, the petitioner paid the income tax for the 1944 royalty payments in the amount of $32,355.50, plus interest in the amount of $9,301.10, and for the 1945 royalty payments in the amount of $10,231.54, plus interest of $3,140.80. Petitioner's entire argument on brief is that its foreign parent was "not engaged in trade or business within the United States, was not liable in 1944 or 1945 for the tax of 30% imposed upon the amount received by foreign corporations not engaged in trade or business within the United States, since the royalties paid to it by petitioner in each of said years were definitely *from sources without the United States.*"

It is necessary only to discuss the petitioner's contentions as to the year 1944, since we are of the opinion that we do not have jurisdiction over the petitioner's income tax liability for the year 1945. Respondent did not determine a deficiency in petitioner's income tax for 1945, and therefore we have no jurisdiction over the overpayment which it claims for that year. *Robert J. Dial*, 24 T.C. 117; *F. A. Gillespie Trust*, 21 T.C. 739. Respondent in this case disallowed in part the petitioner's claims for excess profits tax relief for the years 1940 through 1944 and disallowed them in full for the year 1945. The partial allowance of excess profits tax relief for the years 1940 through 1944 resulted in corresponding deficiencies in income tax for those years. No deficiencies in income tax were determined for 1945. It is clear that the respondent's disallowance of excess profits tax relief for 1945 does not give this Court jurisdiction over the petitioner's income tax liability for such year. The income tax and excess profits tax are separately imposed, and a disallowance of relief from the excess profits tax will not give this Court jurisdiction over a purported overpayment of income tax. *Difco Laboratories, Inc.*, 10 T.C. 660; *Emeloid Co.*, 14 T.C. 1295, reversed on another issue 189 F. 2d 230; *Miami Valley Coated Paper Co.* v. *Commisisoner*, 211 F. 2d 422.

There may be some question as to our jurisdiction with respect to this issue for the year 1944 but if we assume we have such jurisdiction for the said year (cf. *Capital Estates, Inc.*, 46 B.T.A. 986, affd. 138 F. 2d 156), nevertheless we cannot decide the issue in favor of petitioner.

Section 143 deals with the withholding of taxes at the source. Subsection 143(f) provides that, "Where there has been an overpayment of [withholding] tax under this section any refund or credit made under the provisions of section 322 shall be made to the withholding agent *unless the amount of such tax was actually withheld by the withholding agent.*" (Emphasis added.) It is quite clear that the petitioner actually withheld from royalty payments to its foreign parent the amount of $32,355.50 for the year 1944. This amount comes directly under the prohibition of the statute. *Capital Estates, Inc., supra; Bank of America, Nat. Trust & Sav. Ass'n. v. Anglim*, 138 F. 2d 7. In *Capital Estates, Inc., supra*, the Court of Appeals for the Third Circuit said that the fact the taxpayer "was not required by law to withhold that money does not make § 143(f) inapplicable." Petitioner does not argue it would have a right to have the interest ($9,301.10) on the 1944 withholding refunded to it, separate and apart from the amount it withheld and ultimately turned over to the Commissioner.

Even on the merits there was not sufficient evidence in the record to support the petitioner's contention that the royalty payments made to its foreign parent were not subject to United States income tax. We have examined carefully the license agreement and supplements thereto, as well as the assignment agreement executed in 1940 by petitioner and its parent corporation, and we cannot tell from such evidence whether the royalties paid by petitioner to its parent in 1944 and 1945 were from sources within or without the United States. See secs. 119 and 231. We cannot tell from these documents whether, after 1940, the foreign parent owned any patents or processes in the United States, whether the sales upon which the petitioner paid the 5 per cent royalties were made at a point of destination outside the United States, or whether any property rights, patents, or trademarks owned by the foreign parent were used in the United States in connection with the sales purportedly made by the petitioner outside the United States.

The last matter for our consideration is whether in computing the petitioner's excess profits tax liability the petitioner is entitled to deductions under section 23(p) in the amount of $100,000 for 1944 and $97,658 for 1945 on account of contributions made to an employees' profit-sharing trust. This is an attempt to raise a standard issue, the right to a deduction, for excess profits tax purposes only in a proceeding in which the Commissioner did not determine any deficiency

in excess profits taxes and where the only issue properly before the Court relates solely to the question of relief under section 722. *Mutual Lumber Co.*, 16 T.C. 370. However, in view of the fact that a number of circuit courts have disagreed with the Tax Court on this jurisdictional question, it might be appropriate here to say that if we had jurisdiction to decide this question we would decide it for the petitioner on the authority of our decisions in *Surface Combustion Corporation*, 9 T.C. 631, affd. 181 F. 2d 444, and *555, Inc.*, 15 T.C. 671.

Reviewed by the Special Division as to the 722 issue.

*Decision will be entered under Rule 50.*

---

MURDOCK, *J.*, concurring: The petitioner argues a matter on brief not included in the issues raised for decision. It is an attempt to increase the amount stipulated as the average base period net income under the growth formula of section 713(f) by an amount allegedly representing an abnormal deduction for 1939. That is a standard issue rather than an issue arising under section 722. There are at least three answers to this contention: (1) It is not presented for decision by the pleadings; (2) the Tax Court has no jurisdiction; and (3) it is contrary to the stipulated facts.