WLS Investment Company, Incorporated v. Commissioner.
WLS Inv. Co. v. Commissioner
Docket No. 73738.
United States Tax Court
T.C. Memo 1961-236; 1961 Tax Ct. Memo LEXIS 112; 20 T.C.M. (CCH) 1159; T.C.M. (RIA) 61236; August 22, 1961
E. Charles Eichenbaum, Esq., and W. S. Miller, Jr., Esq., Boyle Bldg., Little Rock, Ark., for the petitioner. J. C. Linge, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined a deficiency in petitioner's income tax for the calendar year 1955 in the amount of $8,883.78. The issues for decision are: (1) Whether petitioner sustained deductible losses due to either the demolition, sale, removal or other disposition of dwelling houses located on five separate parcels of real estate; and (2) Whether petitioner may deduct as an ordinary *113 expense the cost of removing and relocating a high compression gas pipeline. Findings of Fact The petitioner, WLS Investment Company, Incorporated, (hereinafter sometimes referred to as WLS) was formed as a split-off in a corporate reorganization, under which it became the owner of the real estate interests formerly held by Big Chain Stores, Inc., (hereinafter referred to as Big Chain Stores) a corporation operating a local chain of retail grocery stores in Shreveport, Louisiana. Originally, petitioner was incorporated under the name Big Chain Realty Company, Inc. Subsequently, the name was changed to the present WLS Investment Company, Incorporated. For the taxable year 1955, corporation tax returns were filed with the district director of internal revenue, New Orleans, Louisiana. The stockholder ownership of WLS and Big Chain Stores is the same. At the time WLS was formed, it became the owner of various leases which were then outstanding with various commercial tenants in shopping center areas in the city of Shreveport, Louisiana. WLS continued to own these leases, and to make new leases on commercial properties from the date of organization until the present time. As of *114 December 31, 1955, petitioner owned only two dwelling houses, which were located at 529 Rutherford Avenue and 3715 Lillian Street. At the time of the trial of this case, petitioner owned only two parcels of land containing dwelling houses. One was located at 529 Rutherford Avenue, which was acquired in 1955, and the other at 535 Rutherford Avenue, which was acquired in 1956. The only residential property acquired by the petitioner which was as much as one or two blocks distant from its shopping centers comprised four lots acquired near the Lakeshore Drive shopping center. One of these lots was sold without improvements and on the other three lots the petitioner placed houses which it had purchased and moved from real estate it had acquired in the Lakeshore Drive shopping area. The three lots were sold after the houses were placed upon them. On September 1, 1951, petitioner acquired a piece of vacant land located on Sanford Avenue. This property was to be used to erect a warehouse; however, it was sold without any improvements having been made on it in 1955. This was the only property acquired by petitioner which was not in or near one of its shopping centers. The only property, *115 either owned or leased by petitioner at the time of the trial, other than the property at 529 and 535 Rutherford Avenue and the property in the Bossier City shopping center, is located in one of petitioner's three shopping centers as follows: (a) Fairfield shopping center. Lots 1 through 6, Jacobs' Subdivision, each 50 x 150 feet, run east and west. Lot 1, the north-most lot, faces Jordan Street, while Lot 6, the south-most lot, faces Jacobs Street. All six lots face Fairfield Avenue on the east. At the rear or west side of the center there is an alley. Lots 20 through 26 are 40 x 150 feet with the exception of Lot 20 which is 60 x 150 feet and run north and south. All the lots face Jacobs Street. The alley in the rear of Lots 4, 5 and 6 also runs beside Lot 20. Petitioner owns Lots 3, 4, 5, 6 and part of Lot 2. It owns store buildings which are located on Lots 3, 4 and parts of Lots 2 and 5. Lot 6 and part of Lot 5 are used for parking. Located on Lots 20 and 21, which petitioner does not own, is a two-story house. At various times petitioner has attempted to purchase this property, but the parties have not been able to come to any type of agreement. On or about April 8, 1952, petitioner *116 acquired Lot 22, Jacobs' Subdivision, also described as 1026 Jacobs Street, for $7,500. Petitioner allocated $5,500 of the cost to the duplex cottage located on the lot, and $2,000 was allocated to the land. Petitioner received the following rental income from the property: Year
Amount
1952 $285
1953
570
1954
630
1955
0 In 1955, the improvements were sold for $400, and the property has remained a vacant lot since that time. At the time petitioner sold the improvements, it had taken depreciation in the amount of $825. On its income tax return for 1955, petitioner deducted $4,275 as a loss on the sale of the improvements. This property has never been used for commercial purposes by WLS. It is separated from the shopping center by Lots 20 and 21 and the alley. Prior to 1955, petitioner leased Lots 23 and 24 for employee parking. These lots are located to the west of Lot 22 (1026 Jacobs Street), which petitioner owns. (b) Rutherford Avenue or Highland Avenue Shopping center. Lots 13 through 18, each approximately 41.66 x 125 feet, run east and west. Lot 13, the north-most lot, faces Rutherford Avenue, while Lot 18, the south-most lot faces Kings Highway. *117 Lots 15 and 16 are separated by an abandoned alley. To the east, all the lots face Highland Avenue. To the west, Lots 13, 14 and 15 abut or face Lot 12. To the west Lots 16, 17 and 18 abut or face Lot 19. Lots 4 through 12, each approximately 41.66 x 125 feet, run north and south. On the north, these lots face Rutherford Avenue and on the south there is an abandoned alley. Lots 19 through 27, each approximately 41.66 x 125 feet, also run north and south. To the north these lots face the aforementioned abandoned alley, and on the south they face Kings Highway. Petitioner owns Lots 5, 6, part of 7, 8, 9, 10 and 11 on Rutherford Avenue, Lot 16 on Highland Avenue and Lots 19, 20, 21 and 22 on Kings Highway. As the lessee, petitioner has a long-term lease on Lot 12 on Rutherford Avenue and Lot 15 and parts of Lots 13 and 14 on Highland Avenue. It owns an undivided interest in and, as the lessee, leases a part of a grocery store building located on part of Lot 14, all of Lot 15, the abandoned alleyway and Lot 16, all on Highland Avenue. On November 18, 1952, WLS purchased the property known as 523 Rutherford Street. (Lot 11, part of Lot 10.) The improvements on the property consisted *118 of a frame dwelling and a garage apartment. In 1952, this property was zoned only for residential purposes. Application to have the property rezoned for a parking lot was made on April 25, 1955. WLS received the following rental income from the property: Year
Amount
1952
$ 92.00
1953
1,146.00
1954
1,156.50
On March 19, 1954, WLS purchased the property known as 525 Rutherford Street. (Lot 10, and part of Lot 9). The improvements on the property consisted of a frame cottage. In 1954, the property was zoned for residential purposes only. Application to have the property rezoned for a parking lot was made on April 25, 1955. WLS received the following rental income from the property: Year
Amount
1954 $405
1955
75 The properties located at 523 and 525 Rutherford Street were adjacent to each other. Petitioner combined these properties in its records and in its tax return, allocating the total cost of $23,000 to apply $5,701.83 to the cost of the land, and $17,298.17 to the cost of the improvements. In 1955, the improvements located on 523 and 525 Rutherford Street were sold for $1,617.50. At the time of the sale, petitioner had taken depreciation *119 in the amount of $1,811.97. On its Federal income tax return, petitioner deducted $13,868.60 as a capital loss on the sale of the improvements. This property was adjacent to commercial property owned by WLS and under lease for operation as a shopping center. The grocery store in the shopping center was remodeled. In 1955, subsequent to the remodeling, parking was expanded for the shopping center and the 523 and 525 Rutherford Street property was converted into parking area. (c) Lakeshore Drive shopping center. This shopping center is located in unit 4 and also block 5 of the city of Shreveport, Louisiana. All the lots in block 5 run north and south. Lots 5, 6, 7 and 8 (block 5), each 40 x 125 feet except for Lot 8 which is about 33 x 125, face Lakeshore Drive. Lots 13, 14, 15 and 16 (block 5), each 40 x 125 feet except for Lot 16 which is about 33 x 125 feet, face Lillian Street. The southern part of Lots 5, 6, 7 and 8 abut against the northern portion of Lots 13, 14, 15, and 16. To the east of Lots 8 and 16, there is a strip of land extending from Lakeshore Drive to Lillian Street, approximately 25 x 250 feet. This was an interstate oil pipeline right-of-way belonging to third *120 parties, which petitioner acquired by quit claim. There was also a high pressure gas line that ran under Lots 13 and 14. In unit 4, Lots 1 through 8 run north and south. Lots 1 through 4 are approximately 40 x 125 feet, Lot 5 is approximately 42 x 125 feet, and Lots 6, 7 and 8 are approximately 50 x 125 feet. All eight lots face Lakeshore Drive. Lot 1 also abutted the interstate oil pipeline right-of-way, while Lot 8, the corner lot, also faced Jewella Road on the east. Lots 9 through 13 run north and south while Lots 14, 15, and 16 run east and west. Lot 9 abutted the interstate oil pipeline right-of-way on the west. Lots 9 through 13 faced Lillian Street on the south and abutted Lots 1 through 5 on the north. Lot 16, a corner lot, faced Lillian Street, also it and Lots 14 and 15 faced Jewella Road on the east. Lots 9 through 12 were 40 x 125 feet, Lot 13 was 41.86 x 125 feet, Lot 14 was 41 x 125 feet and Lots 15 and 16 were approximately 42 x 125 feet. Lots 17 through 21 also run north and south. Lots 22 and 23 run east and west. Lots 17 through 21, on the north, face Lillian Street. These lots are located on the south side of Lillian Street. Lot 22 is a corner lot and faces *121 Lillian Street and Jewella Road. Lot 23 faces only Jewella Road. In the Lakeshore Drive shopping area the petitioner owns Lots 14, 15 and 16 and part of Lot 22 on Jewella Road; Lots 1, 2, 3, 4, 5, 6, 7 and 8 on Lakeshore Drive, Unit No. 4; Lots 6, 7, 8 and part of Lot 5 on Lakeshore Drive, Block 5; Lots 14, 15 and 16 and part of Lot 13 on Lillian Street, Block 5; Lots 9, 10, 11, 12 and 13 on Lillian Street, Unit No. 4; Lots 19, 20, 21 and a part of Lot 18 on the south side of Lillian Street and the former right-of-way consisting of twenty-five feet on the west side of Lots 1 and 9, Unit No. 4. The petitioner owns buildings which are used as a grocery store and nine other stores or shops which are located on Lots 6, 7 and 8 on Lakeshore Drive and Lots 14, 15 and 16 on Jewella Road. On January 2, 1952, petitioner acquired the property known as 3721 Lakeshore Drive (Block 5, Lots 7, 8, 15, 16) for $10,500. This cost was allocated $4,000 to the land and $6,500 to the improvements, a frame dwelling house. At the time of its purchase, this property was zoned for residential use only. WLS received the following rental income from the property: Year
Amount
1952 $480
1953
720
1954
720
1955
150
*122 *p1162 The rent in 1952 was $40only per month because the tenant was a painter who agreed to fix up the house at his own expense. The improvements were removed from this property in 1955, and sold for $1,800. WLS had previously taken depreciation on the improvements in the amount of $825. On its Federal income tax return it deducted $4,275 as a capital loss on the sale of the improvements. On May 13, 1954, WLS purchased the property known as 3735 Lakeshore Drive (Block 5, Lots 6, 14 and part of Lots 5 and 13) for $16,500. This price was allocated $8,000 to the land and $8,500 to the improvements, which consisted of a frame dwelling. At the time this property was purchased a high pressure gas line was running through the property which could not be covered. WLS received the following rental income from the property: Year
Amount
1954 $405
1955
75 The improvements on this property were sold in 1955 for $2,750. At the time of their sale, WLS had taken depreciation in the amount of $389.59. On its Federal income tax return, WLS deducted a loss of $5,360.41 on the sale of the improvements. In addition to the interstate pipeline which separated the Lakeshore plots *123 from the shopping center, the property described as 3735 Lakeshore Drive was traversed by a high pressure gas line, which line was relocated in 1955 by WLS. This high pressure line was relocated by WLS because it had decided to use the area as a parking area. In order to adapt the property to such use, the line had to be moved to the side of the property. In 1954, the interstate pipeline located east of 3721 Lakeshore Drive was abandoned, and the 25 feet of property became available for purchase. WLS acquired the property at this time by a quit claim deed. Sometime in the early 1950's, the city of Shreveport passed an ordinance which required off-street parking to be available before a permit would be issued to construct additional commercial buildings. Opinion Issue 1 During the year 1955, petitioner removed the improvements from five pieces of property which it owned. Four parcels of the land were converted into parking lots, and the fifth, the 1026 Jacobs Street property, has remained vacant. On its Federal income tax return for 1955, petitioner deducted $28,204.01 as a loss on the sale of the aforementioned improvements. Whether petitioner is entitled to the claimed *124 loss depends on whether, at the time it acquired the properties, it intended to demolish or remove the buildings. If petitioner had such an intention, the entire purchase price of the property is to be allocated to the land. Cf. Income Tax Regulations, section 1.165-3(a), 1954 Code. It is petitioner's contention that it did not intend to demolish or remove the existing buildings at the time it purchased the properties in question. Petitioner alleges that it engaged exclusively in the ownership and handling of real estate and other property for investment purposes and throughout the years invested in both residential and commercial properties. Petitioner contends it acquired all the parcels of land because its officers thought that the prices were fair, and also that the return on investment for their use at that time was fair and reasonable. It is pointed out by petitioner that the 1026 Jacobs Street property continued to be rented for residential purposes for three years after its acquisition until it was determined that it would be economically unfeasible to make repairs necessary for continuing rental, at which time the dwelling was sold for $400 and *125 removed, and the property has remained vacant since. At no time, petitioner points out, was the Jacobs Street property ever used for commercial purposes, and moreover it was separated from petitioner's commercial property by two lots and a public alley. Petitioner points out that when it acquired the property at 523 and 525 Rutherford Street in November 1952 and March 1954, respectively, they were zoned for residential use only, and could not be used for commercial purposes. Petitioner also points out that it continued to rent these dwellings until 1955, when they were sold for $1,617.50. These properties were adjacent to commercial property leased by petitioner which contained a grocery store. It is alleged that in 1955 the Rutherford Street property was converted into a parking area because the leased store was remodeled to increase sales volume which necessitated additional parking area. It is petitioner's contention that the remodeling was undertaken because of "the explosion of new shopping centers in Shreveport in 1955, at which time competition became a serious problem to petitioner's lessee." This phenomenon, subsequent to the acquisition of the property, petitioner argues, *126 was the reason for the demolition of the buildings and conversion of the property to a different usage. Petitioner contends that on January 2, 1952, when it acquired 3721 Lakeshore Drive and on May 13, 1954, when it acquired 3735 Lakeshore Drive, they were purchased for investment and for rental as residential property and a fair return was being received on the investments. Petitioner argues that substantial repairs to the 3721 Lakeshore Drive property are convincing evidence of an original intent to continue the existing use of the property. Petitioner points out that when 3721 Lakeshore Drive was purchased, it was separated from the shopping center by two other lots which it did not own and 3721 and 3735 Lakeshore Drive were separated from the shopping center by a 25-foot right-of-way, which later became available without advance notice and to the surprise of realtors. Also, petitioner maintains that at the time of acquisition of both parcels, the parking facilities of the shopping center were adequate, and petitioner had no knowledge that there would be any expansion of the shopping center. It is petitioner's position that the serious economic competitive boom in Shreveport in *127 1955 caused the petitioner to convert the instant parcels. It is respondent's contention that the 5 properties, in question, were acquired with the intent to sell or otherwise dispose of the dwelling houses and use the land for parking areas. To support his position, respondent points out that petitioner's principal source of income was from rental of commercial property. Respondent also points out that except for the Sanford Street property which was acquired for a warehouse site, all the other property purchased by petitioner either adjoined or was located near commercial property owned and leased or leased and subleased by it. Respondent admits petitioner did own four other lots that were outside the commercial area, but points out that these were used for the relocation of houses moved from lots which were to be used as parking lots. Respondent also argues that the return on its investment in the properties was inadequate and negates the idea that it was purchased for investment purposes. We agree with the respondent. Taken alone, the fact that the property at 1026 Jacobs Street was rented for three years after its purchase might indicate that there was no intention to remove *128 the improvements at the time of purchase. Also, the fact that it was separated by two lots and an alley from petitioner's commercial properties lends some added weight to this proposition. To offset these inferences, petitioner has for some time been trying to purchase the property which separates the Jacobs Street property from its commercial property. The facts also show that prior to 1955, two lots (23, 24) which were adjacent to petitioner's property were rented for employee parking. Furthermore, if the property was purchased for its investment value apart from its value as a potential parking area, as petitioner contends, it is inconsistent with that contention that after three years the improvements were in such a state of disrepair that it was necessary to demolish them. Petitioner points out that the Rutherford Street property was zoned only for residential use when it purchased it. There is no evidence and in fact petitioner has made no contention that applications to have property re-zoned in the area are often or, in fact, ever rejected. Subsequently, the property was re-zoned for commercial use. Since the property was located in what was already a commercial area, it *129 would seem unlikely that there had been any serious obstacle to such re-zoning. With regard to petitioner's contention that it made "substantial repairs" to the Lakeshore Drive property, the contention is entitled to little weight. The record is devoid of any evidence of such repairs other than the unsupported conclusion of one of petitioner's witnesses. Petitioner's contention that it owned residential as well as commercial property sheds little light on the real question involved - petitioner's intention at the time of purchase. The evidence shows that the only residential property purchased by petitioner which was not in the immediate commercial area was the Sanford Street property, which was to be used as a warehouse. Also, there were four other parcels that were used to place improvements taken from other lots. Under the circumstances, it appears that the ownership of residential property was only for its potential value as commercial property or its use in connection therewith. Construing the evidence most favorably to petitioner, we can, at best, conclude that petitioner purchased the properties in question with the idea of getting some return on its investment from the *130 rents, but also with the idea that the property would be used for parking if later circumstances warranted. Such mixed motivation is insufficient to sustain petitioner's burden of proof. Each of the five properties was discussed on direct examination by Louis Levy, the petitioner's secretary and treasurer. At the conclusion of the discussion of each piece of property, Levy was asked why petitioner purchased the property. His answers were to the effect that the property was a "good investment" or a "fair investment." However, on cross examination, Levy testified as follows: Q. Do you remember discussing with him [the revenue agent] the reason for having acquired these different pieces of property? A. There was quite a lot of discussion. Q. Did you at any time tell him your purpose or the reason why the corporation acquired this property was for the purpose of constructing parking lots on it? A. I don't think I could have possibly told him that. Q. I want to make sure that you state that you did not tell him that at any time, is that correct? A. If I remember part of the conversation, he tried to pin it down to this way: Is there any possibility of you not thinking at *131 the time of purchase that it could be used or would be used for a parking area? And I would not answer yes or no on that. I told him it was at least five years between the time that we purchased that property and when I had this discussion with him and I told him I couldn't tell him positively what our thoughts could have been at that particular time five years previous. [Italics supplied.] On direct examination there seemed to be little doubt in Levy's mind that the properties were purchased for investment, yet on cross examination, he admitted that at an earlier date he had no way of knowing what petitioner's intentions were. In light of this, Levy's self-serving declaration can be given little weight. In addition, purchase of the properties in question for future use as parking lots is not inconsistent with the idea they were purchased for an "investment." Anything that would insure the continued success of the commercial ventures would seem to be an investment. If the shopping centers did not have adequate parking facilities, there is a distinct possibility that there would be a decline in patronage, which would ultimately lead to reduced revenues from the centers. Petitioner *132 has also tried to negate the possibility that there was an intent to remove or demolish the improvements, in question, by showing that subsequent events brought about the decision to demolish or remove the improvements. These events may have been the factor or factors that brought about the ultimate decision, but it does not necessarily show the original intent. We also take note of the fact that in 1955, WLS had a gross rental income of $175,829.46. The income from the five pieces of property, in question here, was only $300. The gross income from 1954 is not in evidence, but total rental from the five properties amounted to $2,911. This is but another indication of the insignificance of these properties as so-called "investments" apart from their value as potential parking facilities. Based on the entire record, we are not convinced that petitioner's intention at the time it purchased the properties was other than to demolish or remove the improvements. Since petitioner has failed to meet its burden of proof, respondent's determination is sustained. Issue 2 It is petitioner's contention that the cost of relocating the high compression gas line on the Lakeshore Drive property *133 is an ordinary and necessary business expense. [1] It is petitioner's contention that the cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition may be deducted as an expense. It is respondent's contention that the cost of having the pipeline relocated was a capital expenditure which is not deductible, but may be recovered through depreciation during the useful life of the parking lot. Respondent relies on Income Tax Regulations, section 1.263. [2]
*134 We agree with the respondent. The distinction between deductible repairs and nondeductible disbursements is that a repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life. It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired. Expenditures for that purpose are distinguishable from those for replacements, alterations, improvements or additions which prolong the life of the property, increase its value, or make it adaptable to a different use. See Illinois Merchants Trust Co., Executor, 4 B.T.A. 103 (1926); I. M. Cowell, 18 B.T.A. 997 (1930); Home News Publishing Co., 18 B.T.A. 1008 (1930); Phillips & Easton Supply Co., 20 T.C. 455 (1953); Jones v. Commissioner, 242 F. 2d 616 (C.A. 5, 1957), affirming 24 T.C. 563 (1955); Red Star Yeast & Products Co., 25 T.C. 321 (1955). In the instant case, the petitioner had the high pressure gas line relocated so that the property could be used *135 as a parking lot. The expenditure was made to adapt the property to a new and different use. Accordingly, respondent's determination is sustained. Decision will be entered for the respondent. Footnotes
1. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - ↩
2. Income Tax Regulations § 1.263(a)-1 Capital expenditures; in general. (a) Except as otherwise provided in chapter 1 of the Code, no deduction shall be allowed for - (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. * * *
(b) In general, the amounts referred to in paragraph (a) of this section include amounts paid or incurred (1) to add to the value, or substantially prolong the useful life, of property owned by the taxpayer, such as plant or equipment, or (2) to adapt property to a new or different use. * * *↩